# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
### NORTHERN DIVISION

| | |
|---|---|
| ALABAMA MUNICIPAL INSURANCE CORPORATION, a corporation, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CASE NO.: 2:09-cv-00928-WKW |
| | ) |
| ALLIANT INSURANCE SERVICES, INC. a corporation; | ) ) |
| | ) |
| Defendant. | ) |

---

## AMIC'S RESPONSE IN OPPOSITION TO
## ALLIANT'S MOTION FOR SUMMARY JUDGMENT

---

Comes Now the Plaintiff, Alabama Municipal Insurance Corporation ("AMIC"), and opposes the Defendant's Motion for Summary Judgment.  In support of said Opposition, AMIC submits this brief and evidentiary submission:

- Ex. 1 – Deposition of Steve Wells (Doc 43-1);

- Ex. 2 – Alliant's website, www.alliantspecialty.com, last visited November 19, 2010;

- Ex. 3 – Deposition of Doug Wozniak;

- Ex. 4 – Alliant's responses to AMIC's second request for production of documents;

- Ex. 5 – 2000-2001 Contract between AMIC and Alliant, bates labeled AMIC 001249-001256;

- Ex. 6 – PEPIP 2000-2001 policy ("Lloyds" policy) AMIC00001-AMIC000101 (Doc. 43-3);

1

- Ex. 7– Letter from Kopec to Wells, dated March 6, 2003, in subpoena submission of Arthur Gallager & Company;

- Ex. 8– Email from Gerry Lillis to Steve Wells, dated August 26, 2002, in subpoena submission of Arthur Gallager & Company;

- Ex. 9 – Email from Wozniak to O'Meara, dated March 10, 2004, bates labeled Alliant 0012-0013.)

- Ex. 10 – PEPIP 2001-2002 policy "Layer A" bates labeled AMIC 000912-000920.

- Ex. 11 – "Schedule of Reinsurance Companies," AMIC000911;

- Ex. 12 – Alliant Invoice attached as Exhibit 37 to Wozniak deposition;

- Ex. 13 –Email from Wozniak to Wells, September 26, 2002, attached subpoena submission of Arthur J. Gallager & Company;

- Ex. 14 – 2002-2003 policy;

- Ex. 15 – Letter from Davenport to Wells dated February 10, 2004, in the subpoena submission of Arthur Gallager & Company;

- Ex. 16 – Email from Roxana Duke-Afong to Saira Nasim, dated May 11, 2004, in the subpoena submission of Arthur Gallager & Company;

- Ex. 17 – Email from Wozniak to Wells and Abella, dated October 11, 2002, in the subpoena submission of Arthur Gallager & Company;

- Ex. 18 – 2003-2004 policy;

- Ex. 19 – 2004-2005 policy;

- Ex. 20 – Expert Disclosures of Gary J. Martin;

- Ex. 21 – Deposition of Robert Frey;

- Ex. 22 – Alliant's Interrogatory Answers;

- Ex. 23 – Email from Abella, Jr. to Wozniak, dated October 24, 2003;

2

- Ex. 24 – Affidavit of Tony Abella, Jr.;

- Ex. 25 – Letter from Lock to Speagle, dated September 28, 2009, bates labeled AMIC0000177-000181);

- Ex. 26 – Letter from Lock to Stafford, dated October 31, 2008, in the subpoena submission of McClarens Young;

- Ex. 27 – Letter from Lock to Speagle, dated August 16, 2008;

- Ex. 28 – Email from Sullivan to Stafford, dated March 25, 2008, bates labeled Alliant 0220-0222;

- Exhibits filed by Alliant in Support of its Summary Judgment.

## **TABLE OF CONTENTS**

Table of Contents ........................................................................... 3

I.      INTRODUCTION. ................................................................ 4

II.     NARRATIVE STATEMENT OF DISPUTED FACTS. ...................................... 5

    A.      "Welcome to the PEPIP Programs!" The 2000-2001 Contract ............... 5

    B.      The 2001-2002 Contract ................................................... 9

    C.      The 2002-2003 Contract ................................................... 11

    D.      The 2003-2004 Contract ................................................... 11

    E.      The 2004-2005 Contract ................................................... 12

    F.      Alliant is a Managing General Agent ...................................... 12

    G.      Alliant Breached Each Contract with AMIC. ................................ 13

III.    STANDARD OF REVIEW. ........................................................ 15

IV.     ARGUMENT. ................................................................... 17

A.    The Relationship Between AMIC, the Policyholder, and Alliant, the MGA, is Not Defined in Alabama Code (1975) 27-6A-1, *et seq.* ..... 18

B.    The Policies are the Contracts Between AMIC and Alliant ................ 23

    1.)    The fallacy of the Statute of Frauds defense ............................. 23

    2.)    The existence of a contract is a question of fact ........................ 26

    3.)    Policies fully define the responsibilities of the parties. ............ 27

C.    Alliant's Emails Were Emails to Itself .................................................. 28

D.    The "Gentlemen's Agreement" Cannot Be Used in Either Breach or Estoppel Theories ................................................................................ 29

V.    CONCLUSION ................................................................................................ 34

## I.    INTRODUCTION.

AMIC bought Alliant.  That is, when AMIC purchased reinsurance for policy years 2000-2005, what it bought was the services of Alliant, a Managing General Agent (MGA).   The MGA was responsible to AMIC for procuring, handling, adjusting, and even paying AMIC's reinsurance proceeds.   How Alliant accomplished the tasks it contractually agreed to provide AMIC was neither AMIC's problem nor concern.  As shown below, Alliant was contractually bound to AMIC to provide that reinsurance, as it acted in the capacity of a MGA.   To put it colloquially, an MGA holds the pen of the reinsurer; it acts as and/or for a reinsurer with AMIC.

As this Court will easily discern from the facts and arguments below, Alliant

breached its contracts[1] with AMIC by completely failing to handle, adjust, and/or pay the reinsurance proceeds (1) owed to AMIC during 2000-2001 policy year; (2) by timely failing to handle, adjust, and/or pay the reinsurance proceeds owed to AMIC for over three and half years for the 2001-2002 policy year; (3) by timely failing to handle, adjust, submit and/or pay the reinsurance proceeds owed to AMIC for almost four years for the 2002-2003 policy year; (4) by timely failing to handle, adjust, submit and/or pay the reinsurance proceeds owed to AMIC for almost four years for the 2003-2004 policy year; and (5) by timely failing to handle, adjust, submit and/or pay the reinsurance proceeds owed to AMIC for almost three years for the 2004-2005 policy year.

Alliant filed the instant Motion for Summary Judgment in an effort to deflect its responsibilities to AMIC under its various contracts.  To even proffer a colorable argument, Alliant must use a series of deceptive techniques (which this Court has likely seen before) to request its relief:

- Withholding documents and testimony so that it can claim in its Motion that "AMIC has not and cannot cite a single piece of paper…." (Doc. 42 at ¶3; *but see* AMIC's Exhibits 5,6,10,18,&19.)

- Misrepresenting the allegations and facts it decides to share with this Court, *i.e.*, "as reflected in the Wozniak November 1, 2006 email…,

---

1 Alliant incorrectly attempts to color the overview of this case in the Introduction of its Motion by incorrectly stating: "[t]his case involves a single claim for breach of contract…."  (Doc. 42 at 2.) Undercutting that very idea, Alliant proceeds to discuss the five separate contracts that were in place between it and AMIC over the terms at issue.

5

AMIC did not submit its aggregate loss claims…until sometime in late 2006 at the earliest….” (Doc. 42 at ¶21.)

- Making statements of fact for which no evidence exists, *i.e.*, “[Alliant] did not 'adjust' the claims, McLarens Young did that.”  (Doc. 42 at ¶26.)

- Attempting to apply standards not applicable to this case, *i.e.* Alliant's infirm reliance on emails to McLarens Young to relieve it of its contractual responsibilities.  (*See e.g.* Doc. 42 at ¶29.)

However, when finally exposed to the light of the facts, Alliant's arguments in support of summary judgment are without merit and, thus, due to be denied.

## II.    NARRATIVE STATEMENT OF DISPUTED FACTS.

### A.    “Welcome to the PEPIP Programs!” The 2000-2001 Contract.

Steve Wells became President of AMIC in January 2000.  (Deposition of Steve Wells attached as Exhibit One at 11:6)  One of his first tasks was to send an “RFP for broker services.”  (*Id.* at 25:13-15.)  Mr. Wells sent this request to several individuals and entities and it was Tony Abella, Jr. who was awarded the business. (*Id.* at 25:17-18.)  Despite not receiving the broker business, one of the bidders, Alliant, approached Mr. Wells to market its services to become AMIC's “property carrier.”  (*Id.* at 26:9-10.)  The service Alliant marketed was the PEPIP program, which was the “largest property program in the world.”  (*Id.* at 28:4-6; *see also* Alliant's website, last visited November 19, 2010, attached as Exhibit Two.)

6

"PEPIP" stands for "Public Entity Property Insurance Program." (Deposition of Doug Wozniak at 134:6-7, attached as Exhibit Three.)   PEPIP was Alliant's program.  (*Id*. at 134:8-9.)   Alliant agreed with various carriers for the limits and sublimits of its policy.  (*Id*. at 144:18-21.)   AMIC did not have any say as to who the carriers for the PEPIP program were.  (*Id*. at 138:19-22.)   Any audits that would have been conducted under the program would have come through Alliant.  (*Id*. at 142:19-25.)   For its participation in the PEPIP program, Alliant invoiced AMIC for its premiums and AMIC paid Alliant its premiums to be in this program.  (*Id*. at 135:16-17.)   For each policy year, AMIC paid Alliant fifteen percent of the premium amount.   (*Id*. at 32:13-20.)    For the 2000-2001 treaty year, AMIC paid approximately $496,000 to Alliant.  (*Id*. at 148:9-14.)   Alliant cannot produce any payments it allegedly made to any carrier.  (Alliant's responses to AMIC's second request for production of documents at request #18, attached as Exhibit Four.)

The first contract AMIC signed with Alliant was the PEPIP policy in April 2000.  (Ex. 1 at 28:12-13; 2000-2001 Contract AMIC001249-0001256, attached as Exhibit Five.)  After signing onto Alliant's PEPIP program in April 2000, Mr. Wells received the following contract from Alliant: "Welcome to the PEPIP programs! Please find attached the following: 1. Your property binder."   (Ex. 5 at AMIC001249.)  On that contract, Alliant informed AMIC that the invoice for the reinsurance "will follow by mail."  (*Id*.)   That very same document states "this binder is a temporary insurance contract, subject to the conditions shown on the reverse side of the form."  (*Id*. at AMIC001250.)  It was signed by Alliant.  (*Id*.)

Under the "Conditions" section the contract further states:

> "This Company [Alliant] binds the kind(s) of insurance
> stipulated on the reverse side.  The Insurance is subject to
> the terms, conditions, and limitations of the policy(ies) in
> current use by the Company….This binder is canceled
> when replaced by a policy."

(*Id.* at AMIC001251.) Per the Binder attachment, the "Coverage" that was issued
was through the "PEPIP USA Manuscript form."  (Ex. 5 at AMIC001254.)

The PEPIP policy, which was issued to AMIC on the PEPIP policy form, and
arrived at AMIC's office sometime after September 2000, five months after it signed
up for the program.   (PEPIP 2000-2001 policy ("aka Lloyds" policy) at 00002,
attached as Exhibit Five; Ex. 3 at 144:17-21.)  On the cover page under the heading
"PROPERTY POLICIES, LAYER A" only one company is listed – "Robert F. Driver
Associates."  (Ex. 6 at AMIC000006.)  Beginning on AMIC0000010 is the PEPIP
USA policy terms table of contents.   It is printed with the footer "PEPIP2000
MASTER DRAFT…Alabama Municipal."   (Ex. 6 at AMIC0000010-00000100.)
Under these policy terms, the following coverage was provided: "Subject to the
terms, conditions and exclusions hereinafter contained, this Policy insures all
property of every description…of the Insured."  (*Id.* at AMIC000021.)  The policy
terms also provided for "Automatic Coverage" for an increase in value as to existing
insureds of AMIC as follows:

> This Policy provides automatic coverage without
> additional premium, for additions and increases in values
> as respects existing Insureds subject to such increase in
> values not exceeding $ <u>per declaration</u> page and as per
> Endorsement #18 per Insured."

8

(*Id.* at AMIC00024.)   There is no "Endorsement #18" attached to this policy.   (*See*

Ex. 6.)    Similarly, the policy terms provide for "Automatic Coverage" for new

insureds of AMIC:

> Subject to the terms, conditions and limitations in
> Endorsement #15 it is understood and agreed that: (1)
> This Policy is automatically extended to cover all
> additional property as described in this Policy…which
> may be purchased, leased, acquired, or otherwise become
> at the risk of the Insured during the term of this Policy.

(*Id.* at AMIC000031.)    The PEPIP Policy also contains a clause for "Breach of

Conditions":

> Notwithstanding the foregoing, if the Insured establishes
> that the breach, whether contributory or not, occurred
> without its knowledge or permission or beyond its control,
> such breach shall not prevent the Insured from recovering
> under this Policy.

(*Id.* at AMIC000046.)    The PEPIP Policy contains the following "Loss Payable

Clause": "In the event of a loss occurring under this Policy, the loss payment will be

made in favor of the Insured(s) submitting the claim alone, and not to the program

name."    (*Id.* at AMIC000053.)    The PEPIP Policy provides for the "Report of

Values/Premium" that the premium shall be computed by applying the agreed rate

against values commensurate with the valuation clause.   Values declared to the

Insurer are for premium purposes only and shall not limit the recovery under any

area of coverage afforded by this Policy."   (*Id.*)

**B.    The 2001-2002 Contract.**

For the 2001-2002 policy year, AMIC again contracted with Alliant for the

9

PEPIP policy.  (Ex. 1 at 35:5-10.)  For this policy (and all of the others), AMIC's position was that it did not matter nor was it relevant who Alliant used to effectuate backing for the coverage.  (Ex. 1 at 31.)  Indeed, for this policy year (which lasted from November 2001 to November 2002), Alliant did not even send AMIC the policies until March 6, 2003.  (Letter from Kopec to Wells, attached as Exhibit Seven.)  In that letter, Alliant removed "some non-PEPIP endorsements." Under its PEPIP program, Alliant "had to involve DiscoverRe because one reinsurer…could not reinsure an insurance company."  (Email from Gerry Lillis to Steve Wells, attached as Exhibit Eight.)  Thus, when the policy was issued, Alliant considered AMIC's primary layer to be a combination of PEPIP and Discovery Re. (Email from Wozniak to O'Meara, attached as Exhibit Nine.)

AMIC paid Alliant $500,369.00 for its reinsurance.  (2001-2002 "Layer A" primary policy at AMIC000913, attached as Exhibit Ten.)  That same document lists AMIC as both the "Reinsured" as well as the "Insured."  (*Id.*)  Listing as the "Coverage Reinsured," this document states: "Per Coverage Document – Reinsurance, Primary Declarations Page (AMIC) – PEPIP 2001 Declaration (Pages 1-4) Manuscript Form…Pages 1-63 and Endorsements 1 through 18, Pages 63-93." (*Id.*)  Alliant also provided AMIC with a "Schedule of Reinsurance Companies" for this policy year.  (Schedule, AMIC000911, attached as Exhibit Eleven.)  Under the space where would have been listed the "Reinsurer/Syndicate/Synd. No." for AMIC's primary layer of reinsurance, no company is listed.  (*Id.*)

The primary "Layer A" policy contains "General Conditions" which provide:

"all claims covered by this reinsurance shall be binding on the Reinsurer to pay its proportion of loss settlement."  (Ex. 10 at AMIC000914.)   This contract further provides that "Payment of the Reinsurer's proportion of loss and expense incurred by the Reinsured will be made to the Reinsured promply upon receipt and approval by the Reinsurer of satisfactory proof of loss." (*Id.*)

###   C.   The 2002-2003 Contract.

For the policy year 2002-2003, AMIC paid Alliant $1,097,729.00 for its reinsurance.   (Alliant Invoice attached as Exhibit 37 to Wozniak deposition, attached hereto as Exhibit Twelve.)   In preparation for providing that year's reinsurance, Doug Wozniak wrote Steve Wells and informed him that he was trying to "find a home for Discover Re in the placement this year since they supported the AMIC program last year."  (Email from Wozniak to Wells, September 25, 2002, attached as Exhibit Thirteen.)   The policy form on which this reinsurance was issued was entitled Discover Property and Casualty.  (2002-2003 Policy attached as Exhibit Fourteen.)  As with the previous policy, however, Alliant did not deliver the November 1, 2002 to November 1, 2003 until February 10, 2004.  (Letter from Davenport to Wells attached as Fifteen.)

###   D.   The 2003-2004 Contract.

For the 2003-2004 policy year, AMIC paid Alliant approximately $2,000,000.00 for its reinsurance.  (Email from Roxana Duke-Afong to Saira Nasim, attached as Exhibit Sixteen.)  That year, Alliant owed AMIC a reimbursement of premium for approximately $5,000.00.  (*Id.*)  Once again, in preparation for

11

providing reinsurance, Wozniak wrote Wells and AMIC's broker, Tony Abella, that

he was working "on improving our PEPIP pricing for AMIC." (Email from Wozniak

to Wells and Abella, attached as Exhibit Seventeen.) As with the 2002-2003 year,

the form on which the policy was written was entitled Discover Property &

Casualty. (2003-2004 policy attached as Exhibit Eighteen.) This policy's conditions

were substantially similar, if not identical, to those imposed the 2002-2003 policy.

> **E.** **The 2004-2005 Contract.**

For the 2004-2005 policy year, AMIC paid Alliant $1,857,866 for its

reinsurance. (2004-2005 Policy, attached as Exhibit Nineteen). This policy's

conditions were substantially similar, if not identical, to those imposed the previous

year. (*Id.*)

> **F.** **Alliant is a Managing General Agent.**

Alliant is a "managing general agency and national distribution company for

insurance and financial services products." (Ex. 2.)

A MGA is:

> a wholesale insurance intermediary with the authority to
> manage placements of the insurance business of an
> insurer or reinsurer. MGA's also generally provide
> underwriting and administrative services to their clients,
> such as policy issuance, and claims reporting for their
> retail clients on behalf of the insurers they represent.
> They are routinely responsible for reporting claims
> information received from the client, and following up
> with the clients and carrier, all the way through to the
> final resolution of claims.
>
> Typically, MGA's market more specialized coverage, for
> which specialized expertise is required to design and

> underwrite policies. MGA's benefit insurers because such expertise is not always available within the company and would be more costly to develop on an in-house basis. This would be true of public entity business.
>
> MGA's can act as a producer for an insurer, with or without direct binding or underwriting authority, either separately or together with other affiliates, who negotiate insurance/ reinsurance on behalf of the insurance program represented.

(Statement of Expert Disclosures of Gary J. Martin attached as Exhibit Twenty.) Because Alliant handled the "largest property program in the world," it held the pen for several companies and could put any kind of program together "as long as it stays inside the box." (Ex. 1 at 31:3-14.) Alliant's primary responsibility as a MGA was to provide coverage. (Ex. 6 at AMIC000021; Ex. 1 at 39:4-6.) Alliant was also responsible for handling AMIC's claims. (Ex. 1 at 39:8-9.) Robert Frey, a vice-president for Alliant, handled AMIC's claims. (Deposition of Robert Frey at 25:12-19, attached as Exhibit Twenty-One.) For every year at issue, Alliant acted as the MGA for AMIC's reinsurance. (Ex. 20.)

## G.   Alliant Breached Each Contract with AMIC.

In its Interrogatory Responses, Alliant stated under oath that it had no contractual relationship with AMIC of any kind. (Interrogatories Answers attached as Exhibit Twenty-Two; *but see* Ex. 3 at 119:16-19.) Yet, Exhibits 5,6,10,18&19 are all contracts between AMIC and the MGA, Alliant. Alliant also contends it has no agreements with any reinsurers. (Ex. 3 at 178:13-16.)

It is undisputed that AMIC performed all its responsibilities under these

13

contracts: it paid the premiums and provided proper notice of its aggregate losses. (Ex. 3 at 148:13-14; 152:1-4; 167:3-7; 175:8-13; 177:14-18.)   The submission of AMIC's aggregate losses was done on an ongoing basis, understanding that the numbers could change "up or down" until the particular treaty year had fully run. (*See e.g.,* Email from Abella, Jr. to Wozniak, attached as Exhibit Twenty Three; Ex. 3 at 152:1-9.)

On February 1, 2005, AMIC's broker, Tony Abella, Jr. submitted the final aggregate losses on February 1, 2005 for AMIC's policy years 2000-2001, 2001-2002, 2002-2003, and 2003-2004. (Affidavit of Tony Abella, Jr. at¶ 9, attached as Exhibit Twenty-Four; *see also* Doc. 43-7, Email from Abella, Jr. to Wozniak dated February 1, 2005.)  The final aggregate losses for the 2004-2005 policy year were submitted to Alliant on April 8, 2008.  (Ex. 24 at ¶ 10.)  These aggregate losses should have been paid to AMIC within 30 to 90 days of the submission.  (Ex. 20.)  It is undisputed that any losses paid were not paid until at least three or more years later and that the losses suffered for 2000-2001 were never paid.  (Ex. 3 at 170:20-22; 177:1-3, 25-178:1-2.)  At no point did Alliant ever direct, inform, suggest, hint, or in any way indicate that AMIC should or was responsible for providing its notices of loss to another entity.  (Ex. 3 at 104:6-7; 118:22-25-119:1-3.)

During the 2000-2001 policy year, Alliant contends that Steve Wells and Gerry Lillis entered into a so-called "gentlemen's agreement."  (Ex. 3 at 140:8-149:20.)  Mr. Lillis was an employee of Alliant, not an employee of Lloyd's, the carrier under the PEPIP policy.  (*Id.* at 141:21-24).  Alliant never informed Lloyd's

of this "agreement." (*Id*. at 142:1-4.)  Lloyd's, however, later confirmed that it was bound by this alleged "Agreement."  (Letter from Lock to Speagle, attached as Exhibit Twenty-Five.)  AMIC's intent for any "alleged" agreement was marketing only.  (Ex. 1, at 73:2-8.)

In fact, the 2000-2001 policy would not have allowed for such an agreement other than for marketing purposes because, as stated by Lloyd's counsel, "AMIC did not need to report the new members and the additional premium in respect to same until the expiration of the policy."  (Letter from Lock to Stafford at 4, attached as Exhibit Twenty-Six.)  Moreover, even a breach of this alleged "agreement" on the part of AMIC would neither affect nor bar it from "recovering under this Policy." (Ex. 26 at 5.)

It is undisputed that no reinsurer received notice of AMIC's aggregate losses within 30 to 90 days of their submittal.  (Exhibits 27-28.)

## III.   STANDARD OF REVIEW.

"The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Gonzales v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998), *quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed.R.Civ.P. Rule 56(c).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party's burden may be met either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the non-moving party has failed to make a showing "sufficient to establish the existence of an element essential to that party's case as to which [it] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir. 1992) ("One way to seek an award of summary judgment is for the moving party to demonstrate that an essential element of the non-movant's case is lacking.").

After the moving party has met its burden under Rule 56(e), the non-moving party must go beyond the pleadings and designate specific facts from affidavits, answers to interrogatories and/or depositions showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574,586 (1986).

The Eleventh Circuit Court of Appeals has held that where the movant meets the initial burden of showing either that there are no genuine issues of material fact or the absence of evidence to support the non-moving party's case, the burden then shifts to the non-movant to show the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). The court in *Fitzpatrick* held as follows regarding issues on which the non-movant would bear the burden of proof at trial as follows:

16

For issues on which the non-movant would bear the
burden of proof at trial, the means of rebuttal available to
the non-movant vary depending on whether the movant
put on evidence affirmatively negating the material fact
or instead demonstrated an absence of evidence on the
issue.   Where the movant did the former, then the
non-movant must respond with evidence sufficient to
withstand a directed verdict motion at trial on the
material fact sought to be negated.  Where the movant did
the latter, the non-movant must respond in one of two
ways.  First, he or she may show that the record in fact
contains supporting evidence, sufficient to withstand a
directed verdict motion, which was 'overlooked or ignored'
by the moving party, who has thus failed to meet the
initial burden of showing an absence of evidence. *Celotex,*
477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J.,
dissenting).  Second, he or she may come forward with
additional evidence sufficient to withstand a directed
verdict motion at trial based on the alleged evidentiary
deficiency. *Fitzpatrick*, 2 F.3d at 1116 (citation omitted).

## IV.   ARGUMENT.

Alliant's bid for summary judgment is entirely premised on a highly flawed
view of its role and its relationship with AMIC.  AMIC's relationship with the MGA
is not defined by *Alabama Code* (1975) § 27-6A-1, *et.seq.*; that section only applies to
the contractual relationship between the MGA and those reinsurers on whose
behalf the MGA is acting.  AMIC, however, is not the "insurer" under that scheme
but the policyholder for all reinsurance at issue in this case.  AMIC's contractual
relationship with an MGA who is acting as and/or for a reinsurer is defined as a
Reinsurance Intermediary-Manager by *Alabama Code* (1975) 27-5A-1, *et.seq.*
Under the latter statutory scheme, the policies issued, and the documents passing
between the parties, it is undisputed that Alliant, as the MGA, contracted with

AMIC as defined in the policy contracts for the periods 2000-2001, 2001-2002, 2002-2003, 2003-2004, and 2004-2005.   Alliant breached each of those contracts with AMIC.

### A.   The Relationship Between AMIC, the Policyholder, and Alliant the MGA, is Not Defined in *Alabama Code* (1975) 27-6A-1, *etseq.*

Alliant first argues that it cannot be liable to AMIC as a matter of law because it was not acting as AMIC's Managing General Agent ("MGA") as that term is defined in the Alabama Managing General Agents Act, § 27-6A-1, *et seq.*, Ala. Code 1975.   However, that Act does not prescribe the parameters of Alliant's relationship with AMIC and therefore can offer no guidance as to whether Alliant should be held liable for breaching its obligations to AMIC.   In the context of reinsurance as applicable here, the "insurer" referred to in the policy is the *reinsurer*, while AMIC stood in the position of "policyholder."   Thus, Alliant "managed all or part of the insurance business of" the reinsurers with whom it placed AMIC's business, acted as a "producer" for those entities, negotiated reinsurance on behalf of those entities, and underwrote premiums on behalf of those entities for policyholders such as AMIC.   *See* § 27-6A-2(3), Ala. Code 1975.

In short, the Alabama Managing General Agents Act does not apply to Alliant's relationship to AMIC.   AMIC has described Alliant as a MGA in the complaint simply because that is how Alliant has described itself.   (See, e.g., Ex. 2). Furthermore, because the Managing General Agents Act is regulatory rather than descriptive of defenses by which Alliant may attempt to escape its contractual

obligations, Alliant cannot invoke the Act to avoid liability for breaching its contracts with AMIC.  *See* § 27-6A-7(d), Ala. Code 1975 ("No provision of this chapter is intended to or shall in any manner limit or restrict the rights of policyholders...").

Instead, the law that accurately identifies Alliant's role with respect to AMIC is the Alabama Reinsurance Intermediary Act, § 27-5A-1, *et seq.*, Ala. Code 1975. Specifically, Alliant acted as a Reinsurance Intermediary-Manager ("RIM"), as defined in pertinent part therein:

> REINSURANCE INTERMEDIARY-MANAGER.   Any person, firm, association, or corporation who *has authority to bind or manages all or part of the corporation who has authority to bind* or manages all or part of the assumed reinsurance business of a reinsurer, including the management of a separate division, department or underwriting office, and *acts as an agent for such reinsurer whether known as a reinsurance intermediary - manager, manager or other similar term*.

§ 27-5A-2(9), Ala. Code 1975 (Emphasis added).   Under this statutory scheme, Alabama law requires a written contract between the RIM and the reinsurer providing, at a minimum, certain specified terms, including the following: "Within the scope of its actual or apparent authority, the acts of the [RIM] shall be deemed to be the acts of the reinsurer on whose behalf it is acting." § 27-5A-7(14), Ala. Code 1975.  Just as with the MGA's, however, whether the RIM and the reinsurer have complied with their obligations with respect to the Act, their failure to do so would not excuse them from liability to policyholders such as AMIC for breach of any obligations they may have to such policyholders: "Nothing in this chapter is

intended to or shall in any manner limit or restrict the rights of policyholders, claimants, creditors or other third parties or confer any rights to those persons...." § 27-5A-11(d), Ala. Code 1975.

Applying here the statutory definition of an RIM, consistent with logic and fundamental legal principles, it makes no difference what Alliant called itself or how it was known to AMIC, whether as an "[RIM] or manager or other similar term" – even as a MGA. What matters is whether Alliant had actual or apparent authority to act on behalf of the reinsurers with whom it placed AMIC's business. Alliant's convenient game of semantics cannot mask the true nature of its relationship with those reinsurers or its obligation to AMIC when it failed to provide AMIC with the benefit of its bargain under the reinsurance policies it obtained for AMIC.

Here, there can be no rational dispute that, at all times pertinent to this suit, Alliant and its predecessors were acting as RIMs – agents of the reinsurers – and placing reinsurance business for (1) Certain Underwriters at Lloyd's of London for the 2000-2001 policy term of AMIC's reinsurance; and (2) Discovery Re for the terms 2001-02, 2002-03, 2003-04 and 2004-05.  After Driver (Alliant's predecessor) was not awarded a brokerage contract with AMIC in or about January 2000, Gerry Lillis of Driver approached Steve Wells of AMIC and, touting the PEPIP program, told Wells that Driver wanted to "be your [AMIC's] property carrier."  (Ex. 1, 25-26). Under the PEPIP program, Driver would administer a "master group program"

under the terms of which "they've [Driver has] got the box, they're the MGA, they've got the pen, they can do what they want within it, as long as they keep it inside that box." (*Id.*, at 28-29). Specifically, Wells testified, he was told that Driver had the authority to act on behalf of the reinsurers with whom it sought to place AMIC's business:

> [Driver] has the pen for one of several companies, and when they put together a program, they can put that program together any way they want, in any form or fashion, as long as it stays inside the box. Who the carriers were, from where we sat, was not relevant. Driver was – were the folks that were putting the details together within their box they were allowed to do, to quote them again, because they handle the largest property program in the world, they can pretty well do what they want.

(*Id.* at 31).

This kind of all-inclusive, fire-and-forget plan for meeting AMIC's reinsurance needs, where Driver acted as agent for, and with the authority of, the reinsurer, is borne out by a number of documents passing back and forth between AMIC and Alliant and its predecessors. Illustrative of the actual nature of its relationship with AMIC, Alliant (then acting under the name Driver-Alliant Insurance Services) provided AMIC with a "Layer A $5,000,000 Primary Policy" for 2001-02, in which it designated Public Access Underwriting Services, a Division of M.T.S. Insurance Services, LLC, as an "Underwriting Manager" and endowed that entity with specific powers and authorities:

GENERAL CONDITIONS

The liability of the Reinsurer in this Certificate shall follow that of the

Reinsured and, except as otherwise specifically provided in this Certificate, shall be subject to the terms and conditions of the policy reinsured.

* * *

> 14.    The Underwriting Manager named herein is hereby recognized as the Underwriting Manager negotiating this Reinsurance for all business hereunder.  All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss adjustment expense, salvages, and loss settlement(s) relating thereto) shall be transmitted to the Reinsured or the Reinsurer through the Underwriting Manager.  *Payments by the Reinsured to the Underwriting Manager shall be deemed to constitute payment to the Reinsurer.*  Payments by the Reinsurer to the Underwriting Manager shall be deemed to constitute payment to the Reinsured only to the extent that such payments are actually received by the Reinsured.

(Ex. 10) (Emphasis added).  The "Schedule of Reinsurance Companies and Lloyd's Syndicates and Limits" provided by Alliant to AMIC for that year (as last revised on February 13, 2003, after the policy period had concluded) shows that, at least as to the primary layer of coverage, i.e., the $5,000,000 "Layer A", *there was no* named reinsurer – in other words, Alliant *was* the responsible reinsurer as to that layer of coverage.  (Ex. 11).

In that year and subsequent years, tellingly, Alliant typically did not provide the reinsurance policies it had obtained for AMIC until after the policy period had already passed.  For example, Alliant forwarded the 2001-02 policies to AMIC under cover of a letter dated March 6, 2003. (Ex. 7).  The 2002-03 policies arrived with Alliant's letter dated February 10, 2004.  (Ex. 15) As a result, AMIC had only Alliant as the entity it could access to obtain answers regarding any questions or

concerns regarding the policies. This presented no particular problem for AMIC, but it confirmed AMIC's understanding that Alliant was, for all practical purposes, its reinsurer – the entity upon whom it could and should rely to meet its reinsurance needs and the entity to whom it could look in the event there were problems.

Likewise, AMIC was invoiced for premiums and paid its premiums to Alliant. (*See* Ex. 12) Alliant had the ability to bind reinsurers to agreements about which the reinsurers were never informed. (Ex. 3 at 142:1-4; Ex. 25.) AMIC provided all of its notices to Alliant to which it never, not once, informed AMIC was incorrect. Simply, for its reinsurance needs, AMIC hired Alliant, the MGA, not a reinsurer. The means and methods by which the MGA carries its responsibilities in providing reinsurance to Alliant were its own.

## B.   The Policies are the Contracts Between AMIC and Alliant.

### 1.)   The fallacy of the Statute of Frauds defense.

Next Alliant erroneously argues that it is protected from liability by means of § 8-9-2(1), Ala.Code 1975, part of Alabama's Statute of Frauds. That statute provides as follows:

**§ 8-9-2.   Certain agreements void unless in writing.**
In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to by charged therewith or some other person by him thereunto lawfully authorized in writing:

(1) Every agreement which, by its terms, is not to be performed within one year from the making thereof.

\* \* \*

The fallacy of Alliant's argument is demonstrated by the existence of the policies of insurance in question, as well as numerous other documents, correspondence and memoranda, the totality of which preclude any possibility that it can muster sufficient evidence to demonstrate the statute's applicability as a matter of law.  Because Alliant and its predecessors were acting as agents of the reinsurers – whether denominated MGAs or RIMs or otherwise – the contract by which AMIC entered into a relationship with Alliant is the same as the contracts by which it entered into a relationship with the reinsurers over the five-year span in question.  It should be noted, also, that only one of the insurance contracts at issue (the first) was for a period longer than one year – thus, the Statute of Frauds could not apply in any respect to the policy periods 2001-02, 2002-03, 2003-04 and 2004-05, which were limited to a single year and no more.  *See Lane v. Henderson*, 232 Ala. 122, 167 So. 270 (1936) (oral agreement to lease land for a period of one year was outside statute of frauds, even though lease period was to begin at date after the oral agreement was reached.).

If Alliant contends that it had no written contracts demonstrating that it acted as the agent of its principals, the reinsurers, such that it can be bound by its principals' breaches of the insurance contracts, it also does so in error.  The PEPIP program was just such a contract.  As demonstrated above, the PEPIP program gave Alliant (and its predecessors) the authority to underwrite and bind policy

24

coverage by participating reinsurers within certain prescribed parameters. As long as it acted within the "box" detailed by the PEPIP program, Alliant had the specific written authority to contract as it chose to do so.

To the extent that the PEPIP program somehow is deemed not to meet the requirements of a contract that would satisfy the Statute of Frauds, it did so in violation of § 27-5A-7. As discussed above, that statute requires a written contract and provides specific provisions that must be included therein. Furthermore, Alliant's action on behalf of the reinsurer, whether then and there authorized, was later ratified when the Certain Underwriters at Lloyd's of London ultimately declined payment of AMIC's claim, not because of the lack of any written authorization for Alliant to act on its behalf, but because AMIC allegedly had entered into a "gentlemen's agreement" with Alliant, under the terms of which AMIC would not seek its retrocession for the 2000-01 policy period. Accordingly, Lloyd's stated, it was relying on that oral agreement modifying the terms of the original agreement, to withhold payment to AMIC. In doing so, it ratified Alliant's authority to enter it into the original agreement to provide reinsurance.[1]   See Cammorata v. Woodruff, 445 So.2d 867, 873 (Ala. 1983) (oral contract within the statute of frauds is removed from the statute "when it is clearly ratified by the

---

[1]Although not applicable due to the fact that all subsequent policy periods were limited to a single year, the Statute of Frauds would otherwise have not operated against AMIC as to the Discover Re contracts because Discover Re ratified Alliant's actions in binding coverage when it decided to pay the principal amount of each of those claims, leaving only a dispute as to whether AMIC was owed interest during the term of nonpayment.

25

principal.").

Finally, and perhaps most simplistically, the Statute of Frauds does not apply in this instance because the contracts that Alliant claims are subject to them are not executory, but executed.  It has been recognized that Alabama's "Statute of Frauds requiring certain contracts to be in writing applies to *executory* and not to *executed* contracts."  *Carter v. Holland*, 825 So.2d 832, 836 (Ala. Civ. App. 2001) (a lender, having lent money, was only to wait for performance or consideration, thus the contract had been executed and the Statute of Frauds did not apply) (quoting *Scott v. Southern Coach & Body Co.*, 280 Ala. 670, 673-74, 197 So.2d 775, 777 (1967) (emphasis in *Carter*).

Here, it is undisputed that AMIC has paid its premiums, timely forwarded claims and otherwise done all it was required to do in order to fulfill its obligations under the PEPIP program of reinsurance contracts it engaged Alliant to obtain as agent for the various reinsurers.   On that basis, its portion of the contract has been executed, and it now has only to await proper performance; the Statute of Frauds cannot apply.

### 2.)    The Existence of a contract is a question of fact.

While AMIC asserts it is undisputed that the policies in place during 2000-2005 were contracts between it and the MGA, Alliant has chosen a different route for its summary judgment argument, alleging that AMIC "cannot cite a single piece of paper" that is a contract between the parties.  (Doc. 42 at ¶3.)  Alliant can make

such an outlandish statement because it has ignored AMIC's contentions.

Alabama law is absolutely clear that where "evidence is conflicting" as to whether a meeting of the minds existed, it is a question of fact for the jury. *Sunnyland Mobile Homes, Inc. v. Thompson*, 384 So. 2d 1111, 1112 (Ala. Civ. App. 1980); *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Haynes*, 497 So. 2d 82 (Ala. 1986)(holding that "the jury's task was to resolve the questions of fact of whether the Hayneses intended the written contract they received to cover…and whether there was a 'meeting of the minds'").  Likewise, whether a contract exists between two parties is a question of fact for a jury.  *Marshall Durbin Farms, Inc. v. Landers*, 470 So. 2d 1098, 1102 (Ala. 1985).  Thus, if Alliant argues that it assumed only the role of a broker or was not acting as or for the reinsurers, those issues are ones to be determined by a jury.

### 3.)      Policies fully define the responsibilities of the parties.

Alliant also complains that there are no contracts which define the terms between the parties.  As evidence of its argument, Alliant solely relies upon the deposition testimony of a non-attorney, Steve Wells, and ignoring the terms of all the contractual documents now before the Court.  Simply, Alliant can only make this argument by avoiding the terms provided in each contract that it entered with AMIC.  (Exs. 5,6,10,18,&19).  Alliant makes no argument to this Court that those contracts do not provide adequate terms, definitions, and responsibilities.

Also, Alliant argues that it merely received commissions from the reinsurers rather than receiving any consideration from AMIC.  However, the evidence shows AMIC was invoiced every year and that it paid only Alliant, and not any other entity.  While Alliant may allege it was paid "a commission" from the reinsurers, it has produced no documents, even when asked, that support this proposition.  (Ex. 4.)  Even if this allegation were true, the commission funds would have been deducted from AMIC's premiums.  Nevertheless, the only evidence this Court has before it is that AMIC paid Alliant, despite its attempt to distance itself, because it wants to avoid the existence of a contract so that it can present what appears to be a colorable argument in support of its motion for summary judgment.

### C.  Alliant's Emails Were Emails to Itself.

Finally, in an attempt to demonstrate that it fulfilled what it contends was its only responsibility with respect to the claims process – to timely forward AMIC's aggregate losses to the reinsurers – Alliant presents this Court with a litany of emails from Doug Wozniak to Chris Stafford and Robert Frey regarding AMIC's losses.  Alliant's efforts were simply emails to itself.  Robert Frey was an employee of Alliant and responsible for claims handling.  (Ex. 21 at 25:12-19.)  Every single email cited by Alliant in an effort to deflect its responsibility went to Frey.  Likewise, McLarens Young (Chris Stafford) was yet another entity or subdivision of Alliant used to perform the claims handling tasks under the PEPIP policies.  (Ex. 6, 10.)  For the policies issued by Discover Re, claims handling was noticed to be

"TBD" – "To Be Determined."  Thus, the emails from Wozniak to Stafford and Frey were merely Alliant's emails to itself.  These emails did not, in any way, fulfill any duty Alliant had to AMIC.

It is undisputed, furthermore, that neither Lloyd's or Discover Re were timely provided with notice of AMIC's losses under each of these policies.  (Exs. 27-28.)  As Chris Sullivan of Discover Re asked in his email to Chris Stafford and Chris Wozniak dated March 17, 2008 – more than three years after notice had been given to Alliant – "We want to know why we were notified in February 2008, *for the first time*, of these large aggregate claims?"  (Ex. 28.)  Similarly, Lloyd's of London was not informed of AMIC's aggregate losses until at least August 2008.  (Letter of Locke to Speagle, Ex. 27.)  Alliant is, therefore, responsible to AMIC for its breach of contract.

### D. The "Gentlemen's Agreement" Cannot Be Used In Either Breach or Estoppel Theories.

What both sides to the instant litigation can agree upon is that Steve Wells, as President of AMIC, and Gerry Lillis, on behalf of Alliant, entered into a "Gentlemen's Agreement" with regard to the 00/01 Lloyd's policy of reinsurance.  Regarding this Gentlemen's Agreement, however, this is where common ground between the parties ends.  As Alliant stated in its brief, "AMIC's version of the Gentlemen's Agreement differs somewhat than Alliant's" (Doc. 42 at 10).  It is now apparent that the parties' views as to the meaning of the Gentlemen's Agreement differ a great deal more than Alliant would have this Court believe.

It is undisputed that the Gentlemen's Agreement between the parties is non-binding under any interpretation of existing contract law.  Alliant has not put forth any legal argument that such an agreement is enforceable at law, or that AMIC breached the terms of any enforceable contract.  As such, Alliant relies on equitable principles of estoppel to defend its breach of their 2000-2001 reinsurance contract with AMIC.  To do so, however, Alliant effectively admits that it was at all times acting as a MGA, in its relationship for AMIC, with regard to, at the very least, the 2000-2001 policy year.

Under the terms attributed to the Gentlemen's Agreement by Alliant, AMIC agreed not to submit its aggregate losses under the Lloyd's policy to Alliant.  (Brief at 39).  Alliant maintains that in return for this promise by AMIC, AMIC would not be charged an additional "catch-up" premium by Lloyd's to compensate Lloyd's for insuring the additional property added by AMIC during the applicable treaty years.  (Brief at 10).  Lloyd's understanding of the Gentlemen's Agreement is identical to that of Alliant, and Lloyds admits that it was made party to said agreement without its knowledge by Alliant's Gerry Lillis.  (*See* Ex. 25).   Thus, Alliant, as MGA for AMIC, effectuated an agreement involving AMIC and Lloyd's as to the 00/01 policy which was to materially affect each entities' rights and responsibilities regarding AMIC's contract for reinsurance.  As evidenced by correspondence from Lloyd's counsel, this agreement, which Lloyd's considered itself bound by, was not made known to Lloyd's until well after the agreement was entered into between Steve

Wells and Gerry Lillis.  (*See* Ex. 25).  As such, it is evident that Alliant "had the pen" of Lloyd's with regard to this policy, and it cannot be disputed that Lloyd's considered itself bound by the actions of Alliant.  Any arguments to the contrary, such as Alliant's assertion that it was nothing more than a broker between AMIC and Lloyd's, are not supported by the evidence.

As set out in detail above, Alliant maintains that it was not responsible for transmitting AMIC's reported aggregate loss amounts for the 2000-2001 treaty year under the terms of the Gentlemen's Agreement.  As such, Alliant argues, AMIC should be estopped from prosecuting its claims for the 2000-2001 treaty year because Alliant relied, to its detriment, on AMIC's assertion that it would not submit these losses for said year.  While AMIC disputes the interpretation of the Gentlemen's Agreement attributed to Alliant in its brief, it is not necessary to parse out language in subsequent emails to determine whether Alliant should be afforded the equitable protection it seeks.  Alliant, under the terms of the contracts entered into with AMIC, did not rely to its detriment on any assertions made by AMIC, and further, Alliant's own misrepresentations concerning the contract provisions prevent Alliant from being entitled to any equitable relief.

Alabama Courts have long been reluctant to permit enforcement, by the application of promissory estoppel, of promises made contemporaneously with a completed contract.  *See Davis v. University of Montevallo, et al.*, 638 So.2d 754, 758 (Ala. 1994).  In the matter at hand, there exist no fewer than five written contracts

consisting of hundreds, if not thousands, of pages detailing the agreement between AMIC and Alliant.  With respect to all these contracts, AMIC has paid its premiums in full and discharged all obligations owed by it under the contract terms. Moreover, AMIC's contracts, including those involving the PEPIP program, were drafted solely by Alliant.  (*See* Ex. 3 at 134:8-9.)  As the party drafting said contracts, it cannot be disputed that Alliant was familiar with the specific terms of each agreement.

Alliant informed AMIC that if it submitted aggregate losses for the 00/01 treaty year, AMIC would be responsible for paying a "catch-up" premium payment to compensate Lloyds for reinsuring the additional property AMIC added during that treaty year. (Brief at 39).  As mentioned above, however, AMIC had previously paid Alliant approximately $496,000.00 in premium payments to cover the property originally insured during the 2000-2001 treaty year.  Thus, under Alliant's alleged interpretation of the Gentlemen's Agreement, Alliant was entitled to $496,000.00 in premium payments from AMIC with AMIC getting in return, exactly zero property reinsured.  Alliant goes on to argue that even though it accepted nearly half a million dollars in premium payments from AMIC during this 00/01 treaty year, neither Alliant nor Lloyd's owed AMIC anything in return.  Alliant now argues, under an extremely self-serving and inconsistent interpretation of the doctrine of promissory estoppel, that it would be an "injustice" if Alliant were required to make payment for the losses that AMIC paid $496,000.00 in premiums to cover.  As it

stands, AMIC reaped absolutely nothing in return for the nearly half a million dollars that AMIC paid in insurance premiums during the 00/01 treaty year.  This is not the type of "injustice" the Court envisioned when reaching its decision in *Bush v. Bush*.  See 177 So.2d 568 (Ala. 1965).  At the very least this is not a question that is proper for a summary judgment determination.

Next, the Endorsement No. 15 to the 2000-2001 contract between AMIC and Alliant ("Automatic Acquisition Clause") prohibits Alliant from recovering for promissory estoppels.  This provision, as Alliant is aware, deals with the specific set of circumstances encountered by the parties in this case.  Subsection 3 to this endorsement is titled "Provisions Applicable to new/deleted Named Insured Members."  The subsection goes on to state that "[t]he reporting of new/deleted named insured members to underwriters and the applicable additional or return premium will be provided to/from the underwriters…at expiration with additional/return premium applicable on an ensuing year basis." (emphasis in original).  As mentioned above, AMIC gained new insured members/properties during the course of the 00/01 treaty year.  Under the terms the contract, therefore, AMIC was not responsible for an immediate "catch-up" payment as Alliant states, but any such payment would only be payable the ensuing year following AMIC's reporting of the new insured members.  Alliant's position that AMIC would immediately owe a "catch-up" premium is directly contradicted by the terms of the contract.

Finally, the alleged modification fails to identify the new, independent consideration, and is, thus, void and unenforceable under Alabama law. *Rains v. Patton*, 67 So. 600, 601 (Ala. 1914). Also, this oral modification, by Alliant's own argument would be void because "contracts required to be in writing cannot be modified by subsequent parol agreement." *Patrick v. Crain*, 571 So. 2d 285 (Ala. 1990.) Alliant's motion is, therefore, legally infirm.

## V.    CONCLUSION.

Alliant has failed to proffer any viable arguments in support of its Motion for Summary Judgment. If Alliant persists that it is not bound to AMIC under the terms if each policy that it provided AMIC, then that is a question of fact for the jury to resolve. Either way, Alliant's Motion for Summary Judgment (Doc. 41) is due to be denied.


    **/s/ Scott M. Speagle**
SCOTT M. SPEAGLE (0705-T-78-S)
THOMAS McCARTHY
Attorneys for Plaintiff


OF COUNSEL:

WEBSTER, HENRY, LYONS, WHITE,
 BRADWELL & BLACK, P.C.
Post Office Box 239
Montgomery, Alabama 36101-0116
Telephone:   (334) 264-9472
Facsimile:   (334) 264-9599
Email:       scott@websterhenry.com

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing has been served on the following by directing same to her office address via United States first class mail, postage prepaid or by electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing on this the 22nd day of November 2010:

John W. Scott, Esq.
Kimberly W. Geisler, Esq.
Michael G. Green, II, Esq.
SCOTT DUKES & GEISLER, P.C.
2100 Third Avenue North, Ste. 700
Birmingham, Alabama 35203

                                       **/s/ Scott M. Speagle**
                                       OF COUNSEL