IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ALABAMA MUNICIPAL INSURANCE CORPORATION, | ) ) ) |
| Plaintiff Counterdefendant, | ) ) ) |
| v. | ) CASE NO. 2:09-CV-928-WKW [WO] ) |
| ALLIANT INSURANCE SERVICES, INC., formerly known as DRIVER ALLIANT INSURANCE SERVICES, formerly known as ROBERT F. DRIVER ASSOCIATES, | ) ) ) ) ) ) |
| Defendant Counterplaintiff. | ) ) |

## ORDER ON PRETRIAL CONFERENCE

A pretrial hearing was held in this case on February 4, 2010, wherein the following proceedings were held and actions taken:

1. PARTIES AND TRIAL COUNSEL:

For Plaintiff: Scott M. Speagle, Esq.
Thomas M. McCarthy, Esq.
Webster, Henry, Lyons, White, Bradwell & Black, P.C.
P.O. Box 239
Montgomery, Alabama 36101

For Defendant: John W. Scott, Esq.
Kimberly W. Geisler, Esq.
Michael G. Green, Esq.
Scott Dukes & Geisler, P.C.
211 Twenty-Second Street North
Birmingham, Alabama 35203

COUNSEL APPEARING AT PRETRIAL HEARING:

For Plaintiff:          Scott M. Speagle, Esq.
                        Thomas M. McCarthy, Esq.

For Defendant:          John W. Scott, Esq.
                        Kimberly W. Geisler, Esq.


2.     JURISDICTION AND VENUE: The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332.  Venue is proper in the Middle District of Alabama, Northern Division.  The parties do not contest jurisdiction or venue.

3.     PLEADINGS: The following pleadings and amendments were allowed:

   (a)   Complaint
   (b)   Amended Complaint
   (c)   Answer to Amended Complaint and Affirmative Defenses
   (d)   Amended Answer, Affirmative Defenses, and Counterclaim
   (e)   Answer and Affirmative Defenses to Counterclaim

4.     CONTENTIONS OF THE PARTIES:

(a)    The Plaintiff/Counterdefendant:[1]

AMIC contends that for policy years 2000-2005 it purchased reinsurance from Alliant, who at all times represented itself to be and acted as a Managing General Agent.  Alliant was contractually bound to AMIC, as an MGA, to obtain, provide, handle, adjust, and even pay any losses suffered by AMIC and covered by the reinsurance.

The undisputed facts show that in 2000, AMIC issued a request for broker services.  Alliant bid for and lost that bid. AMIC's broker contract was awarded to Tony Abella, Jr., of Arthur Gallagher & Co.  Mr. Abella was AMIC's broker at all times during this litigation.

Shortly thereafter, AMIC and Mr. Abella AMIC's broker, were contacted again by Alliant, which offered the PEPIP program, the largest property program in the world.  Alliant represented that it was the MGA for this program and that AMIC was not able to access the program directly. AMIC entered into a contract with the MGA, Alliant, for the May 2000-November 2001 policy year. That contract was written, bound, and issued by Alliant.  Pursuant to that contract, Alliant could, and did, make final underwriting decisions for the insurer, such as extending the policy term from May

---

[1] Alliant set forth its "legal contentions" in this section.  AMIC's legal contentions are adequately presented in its Response in Opposition to Alliant's Motion for Summary Judgment. "Legal Contentions" as part of a "proposed pre-trial order" are inappropriate.

2001 to November 2001. Alliant could, and did, produce all of the public entity portion of any reinsurer's business. AMIC paid Alliant fifteen percent of the cost of the reinsurance premium for Alliant's services.

AMIC timely submitted to Alliant its final, primary layer aggregate property losses under the 2000-2001 policy on February 1, 2005 to Alliant. Those property losses were owed to AMIC on or before May 2, 2005. However, the alleged reinsurer for this policy did not receive notice of these property losses until the summer of 2008. The alleged reinsurer, more importantly, had never seen the insurance policy that Alliant now states the reinsurer issued, until the fall of 2008.

Alliant breached its contract with AMIC by failing to timely submit and/or pay the aggregate losses due AMIC under this policy, which amounts to $511,903.64, including interest through the date the trial will be submitted.

In the fall of 2001, Alliant attempted to move AMIC's block of business from one reinsurer to another. Alliant issued AMIC another PEPIP policy, this time including another entity, DiscoverRe, on the risk. Once again, AMIC paid Alliant fifteen percent of the cost of the reinsurance premium for its services. The policy year was from November 1, 2001 to November 1, 2002. Alliant did not even bind and issue this policy to after the policy year issued.

On February 1, 2005, AMIC timely submitted its primary layer aggregate property losses for the 2001-2002 policy year. The losses were due to be paid on or before May 2, 2005. The alleged reinsurer did not receive notice of these losses until the interest calculation in March 2008. AMIC was paid for the losses in August 2008. Alliant breached the 2001-2002 contract with AMIC by failing to properly transmit the losses and/or pay the aggregate losses. AMIC is due 32,100.28 in lost interest, through the date of the initial filings and complaints.

In the fall of 2002, Alliant once again began moving AMIC's block of reinsurance. Alliant bound and issued a policy to AMIC, this time on a DiscoverRe policy form rather than a PEPIP form, for the policy term of November 1, 2002, to November 1, 2003. However, Alliant did not even bind or issue this policy to AMIC until February 2004. AMIC paid Alliant fifteen percent of the cost of the reinsurance premium.

On February 1, 2005, AMIC timely submitted its primary layer aggregate property losses for the 2002-2003 policy year. The losses were due to be paid on or before May 2, 2005. The alleged reinsurer did not receive notice of these losses until March 2008. AMIC was paid for the losses in January 2009. Alliant breached the 2002-2003 contract with AMIC by failing to properly transmit the losses and/or pay the aggregate losses. AMIC is due $156,238.98 in lost interest, through the date of the complaint initial filing, and will supplement prior to trial. Also, AMIC's broker, Tony Abella, Jr. found an error in Alliant's calculation of AMIC's property losses that resulted in an underpayment of those losses for $38,273. It was Alliant's responsibility as the MGA to properly calculate those losses.

In November 2003, Alliant bound and issued another policy to AMIC on the DiscoverRe policy form. The policy term was from November 2003 to November 2004. On February 1, 2005, AMIC timely submitted its primary layer aggregate property losses for the 2003-2004 policy year. The losses were due to be paid on or before May 2, 2005. The alleged reinsurer did not receive notice of these losses, until March 2008. AMIC was paid for the losses in January 2009. Alliant breached the 2003-2004 contract with AMIC by failing to properly transmit the losses and/or pay the aggregate losses. AMIC is due $46,639.55 in lost interest, through the date of the complaint intial filing, and will supplement the interest calculation prior to trial.

In November 2004, Alliant bound and issued another policy to AMIC on the DiscoverRe policy form. The policy term was from November 2004 to November 2005. On April 8, 2008, AMIC timely submitted its primary layer aggregate property losses for the 2004-2005 policy year. The losses were due to be paid on or before July 8, 2008. The alleged reinsurer did not receive notice of these losses, until the summer of 2008. AMIC was paid for the losses in February 2009. Alliant breached the 2004-2005 contract with AMIC by failing to properly transmit the losses and/or pay the aggregate losses. AMIC is due $64,983.43 in lost interest, through the date of the complaint initial filing, and will supplement the interest calculation prior to trial.

Alliant breached each contract it had, as defined by the policies, with AMIC. AMIC is owed the aggregate loss for the 2000-2001 policy year as well as the miscalculation for the 2002-2003 policy year. AMIC is also due its lost interest for the 2001-2002, 2002-2003, 2003-2004, and 2004-2005.

(b)   The Defendant/Counterclaimant:

I. Factual Contentions

Alliant contends that it acted as a reinsurance broker for AMIC for the years 2000-2005, and that it obtained property reinsurance policies for AMIC for those years. Alliant contends that it fulfilled any obligations it may have owed AMIC as a reinsurance broker. AMIC alleges in its Amended Complaint that Alliant acted not as a reinsurance broker, but as a Managing General Agent (or "MGA") for AMIC to obtain reinsurance for Plaintiff for the years 2000-2005. AMIC contends that as an MGA, Alliant had additional contractual obligations that a broker would not have had, including unspecified "claims handling" obligations. AMIC has never produced a written MGA contract between it and Alliant. Alliant contends that AMIC's failure to produce such a contract is the result of the simple fact that there is not and never has been such a contract (or contracts).

AMIC specifically and plainly alleges in its Amended Complaint that there was an MGA contract in existence between it and Alliant for the years 2000-2005. AMIC alleges in its Amended Complaint that Alliant owed certain duties to AMIC as its MGA. AMIC alleges that Alliant breached its duties as an MGA for AMIC by failing to "properly transmit" notice of certain of AMIC's losses to the reinsurers. As a result, AMIC is claiming that the losses were not timely paid

4

by the reinsurers and that as a result Alliant is responsible for the payment of interest on the losses for the 2001-2005 years, and in the case of the Lloyd's of London policy in effect for 2000/2001 years, is also responsible for the payment of the losses themselves, as well as interest. Alliant denies these allegations in their entirety.

AMIC is an insurance company located in Montgomery, Alabama. It is licensed and regulated by the Alabama Department of Insurance. AMIC writes certain types of insurance, including property and casualty insurance, for towns and municipalities in the State of Alabama.

Alliant acted as a reinsurance broker in procuring for AMIC the reinsurance policies at issue in this case, namely certain property reinsurance policies for AMIC for the years 2000-2005. As a reinsurance broker, Alliant was paid a commission of 15% by the reinsurers, a portion of which was paid to other reinsurance intermediaries involved in the placement of the reinsurance at issue. AMIC did not pay Alliant anything for its services as a reinsurance broker or for its services in procuring the reinsurance at issue.

"Reinsurance" is defined as "a contractual arrangement whereby a reinsurer, for consideration, agrees to indemnify a reinsured for all or part of a loss that the reinsured may sustain under a policy or policies of insurance issued by the reinsured to an original insured. Thus, reinsurance is a contract by which one reinsurer insures the risks of another insurer and the true reinsurer is merely an insurance company or underwriter which deals only with other insurance companies as its policyholders. The reinsurer agrees to indemnify the reinsured on the risk transferred or ceded." J. Diaconis & D. Hammond, *Reinsurance Law* § 1:1.1 (4th ed. 2009)(collecting cases)(internal quotation marks and citations omitted).

As broker, Alliant obtained the following reinsurance for AMIC, as set forth for the most part in AMIC's Amended Complaint:

      a.      In 2000-2001, Alliant obtained for AMIC reinsurance policy LU0022884. The reinsurers for that policy were Those Various Underwriters of Lloyd's of London ("Lloyd's"). The policy term for the Lloyd's reinsurance policy was May 1, 2000 to November 1, 2001.

      b.      In 2001-2002, Alliant obtained for AMIC a reinsurance policy, which was insured by both Discover Re and Kemper Insurance, formerly known as Specialty National Insurance Co. The Discover Re policy was issued under policy no. D003F0007 and the Specialty National policy was issued as policy no. 3XZ 162352 00. Each of these policies covered 50% of the risk reinsured. The term for each of these policies was from November 1, 2001 to November 1, 2002.

      c.      In 2002-2003, Alliant obtained for AMIC reinsurance policy D003R00028. The reinsurer for this policy was Discover Re. The term for the policy was from November 1, 2002 to November 1, 2003.

      d.      In 2003-2004, Alliant obtained for AMIC reinsurance policy D0003R00034. The reinsurer for this policy was Discover Re. The term for the policy was from November 1, 2003 to November 1, 2004.

      e.      In 2004-2005, Alliant obtained for AMIC reinsurance policy D0003R00040. The reinsurer for this policy was Discover Re. The term for the policy was from November 1, 2004 to November 1, 2005.

AMIC made certain loss claims under the reinsurance policies at issue, commonly referred to as the "aggregate property loss claims", beginning in the early 2000s. The aggregate property loss claims were made on claims paid for property losses incurred by AMIC's underlying insureds. The claims adjuster for the reinsurers, McLarens Young, audited certain files at AMIC's Montgomery headquarters in August 2004 for the 2001/2002 and 2002/2003 aggregate property loss claims. Although not contractually obligated to do so, Alliant forwarded these loss claims to a third party claims administrator, McLarens Young. McLarens Young audited and adjusted these claims on behalf of the reinsurers. McLarens Young was paid by the reinsurers for its services. It is a common practice to have a claims adjuster review losses prior to payment of those losses by reinsurance companies and there was nothing unusual about McLarens Young's role in adjusting the aggregate property loss claims at issue in this lawsuit. Chris Stafford was the primary person responsible for adjusting the claims for McLarens Young. AMIC admits that the aggregate loss numbers its submits can change over the years for several years after the end of a particular policy year, and that AMIC itself was adjusting the amount of some of the aggregate property losses as late as 2010.

The claims submitted by AMIC under the reinsurance policies issued by Kemper and Discover Re were paid by these reinsurers. In fact, Kemper and Discover Re paid AMIC over $1.2 million in aggregate property losses. AMIC claims, however, that Kemper and Discover Re were slow in paying the claims. AMIC in its Amended Complaint alleges that these claims were not timely paid because Alliant did not timely forward the claims to the reinsurers for payment. Alliant contends that the record clearly shows that although it had no contractual obligation to do so, it promptly forwarded the losses to McLarens Young when received them from AMIC. Furthermore, the record shows that although not contractually bound to do so, Alliant followed up consistently with McLarens Young to press for payment of the losses. Nonetheless, AMIC contends that Alliant is responsible for alleged lost interest on these aggregate property losses, totaling several hundred thousand dollars. AMIC has never pursued the reinsurers for its purported losses.

As to the Lloyd's policy, which was in effect from 2000-2001, Steve Wells, the President of AMIC, entered into a Gentlemen's Agreement whereby AMIC said that it would not submit any losses for payment by the reinsurer under that policy. Alliant maintains that AMIC's agreement not to make claims for aggregate losses under the Lloyd's policy was premised upon the fact that AMIC added additional municipalities as insureds during the policy period, that as a result of these additional insureds, the "total insured values" under the Lloyd's policy more than doubled, and that if AMIC made claims under the Lloyd's policy, it would be obligated to make additional premium

payments that would be in excess of the recoverable losses. This is the one of the positions that Lloyd's has taken with respect to the claims subsequently by AMIC under the Lloyd's policy.

AMIC's version of the Gentlemen's Agreement was that AMIC would not make any aggregate loss claims under the Lloyd's policy as long as Alliant, in the words of Steve Wells, "treated me fairly." When asked what he meant by that, Wells testified that AMIC agreed that it would not make any aggregate loss claims under the Lloyd's policy as long as AMIC was being paid in a timely fashion for the aggregate loss claims under the other reinsurance policies. Wells, years after the expiration of the Lloyd's policy, insisted that Alliant submit the 2000/2001 aggregate property loss claims to Lloyd's despite the existence of the Gentlemen's Agreement and Alliant's reliance thereon.

While AMIC's version of the Gentlemen's Agreement differs somewhat than Alliant's, both interpretations are fundamentally similar in that AMIC agreed with and so informed Alliant that it would not make claims for any aggregate losses under the Lloyd's policy. Nonetheless, AMIC now seeks to hold Alliant responsible for payment of both the losses under the Lloyd's policy and the purported lost interest, although it did not submit those losses until years after the Lloyd's policy had expired and despite the fact AMIC never paid the additional premiums associated with more than doubling the total insured values under the Lloyd's policy. AMIC has never sued Lloyd's or demanded arbitration against it for payment of these losses.

## II. Legal Contentions

AMIC's theories of the case and assertions as to Alliant's role have been constantly changing throughout this litigation. Early on, AMIC admitted that Alliant was in fact a broker, which is accurate. In its Amended Complaint – the controlling pleading in this case – AMIC asserts that Alliant had an MGA contract with AMIC and served as an MGA for AMIC, with certain amorphous and unspecified duties and responsibilities. AMIC's Amended Complaint contains a single count for breach of contract against Alliant alleging that Alliant failed to timely transmit the losses to the reinsurers for payment in violation of its purported MGA contract with AMIC.

By the time of its summary judgment response brief, AMIC was asserting variously and contradictorily that Alliant was its MGA, was an MGA for the reinsurers, was a "Reinsurance Intermediary-Manager" under Alabama law, and was actually the reinsurer on the various reinsurance policies at issue in this case. As set out in detail in Alliant's summary judgment materials, AMIC's creation of new claims and theories in an attempt to avoid summary judgment is contrary to the Scheduling Order governing this case, the applicable Rules of Civil Procedure and the mandates of the Eleventh Circuit.

AMIC's Amended Complaint controls in this case. Alliant has taken discovery, litigated this case, and filed a summary judgment motion based upon the allegations and breach of contract claim in the Amended Complaint. The Amended Complaint clearly alleges that Alliant had an MGA contract with Alliant and acted as AMIC's MGA in regards to the reinsurance policies at issue. The

Amended Complaint at ¶ 38 states in a simple and clear declarative sentence: "Alliant and AMIC entered into an MGA contract." At ¶ 40, AMIC states: "Alliant is in breach of the MGA contract with AMIC because it failed to timely transmit losses suffered by AMIC pursuant to the reinsurance policies obtained in 2000-2001, 2001-2002, 2002-2003, 2003-2004, and 2004-2005." AMIC also specifically identifies the reinsurers on the reinsurance policies at issue, namely Those Various Underwriters at Lloyd's, Kemper and Discover Re. Steve Wells, the President of AMIC and its corporate representative, testified that the alleged MGA contract at issue in this case was between AMIC and Alliant. Alliant objects to any attempt by AMIC to amend its pleadings at this late date to assert claims or allegations inconsistent or contradictory to the claims and allegations in the Amended Complaint.

There was no MGA contract between Alliant and AMIC. Nor was there any contract that obligated Alliant to ensure that the reinsurers paid the aggregate property losses timely or at all. Alliant served as a reinsurer broker and it procured reinsurance coverage for AMIC. Alliant was not paid a penny by AMIC for its reinsurance brokerage services or for any other services. Alliant was paid a commission by the reinsurers out of the premium payments made for the reinsurance policies. Alliant was not a party to any of the reinsurance contracts and is in no way liable on the reinsurance contracts for payment of the aggregate property losses. AMIC has not produced any contracts that show Alliant was obligated in any way to AMIC in the various roles that AMIC has alleged Alliant played in the course of this litigation. AMIC's case instead rests upon unwarranted and unsustainable inferences from isolated documents taken from a large universe of documents in this case.

AMIC's breach of contract claim thus fails for a number of reasons. A number of these reasons are set forth in detail in Alliant's summary judgment brief and in its reply brief. Under Alabama statutory law and insurance regulations, Alliant was not – and legally could not have been – a Managing General Agent for AMIC. Alliant does not come within the statutory definition of a Managing General Agent or even the definition of an MGA offered by AMIC's expert witness, Gary Martin. Second, AMIC has been unable to identify any contract between it and Alliant that establishes an MGA relationship or any relationship for that matter, much less establishes the terms or conditions of any such contract. Any alleged contract thus fails for indefiniteness. Moreover, AMIC has admitted that it did not pay Alliant any consideration for this purported MGA contract.

Third, as the alleged MGA contract could not have been performed within one year, it is barred by the statute of frauds. Moreover, and in any event, the record clearly shows that Alliant forwarded the claims in a timely manner to the reinsurers and followed up consistently to press for payment.

The breach of contract claim as to the Lloyd's policy also fails because of the Gentlemen's Agreement, whereby Steve Wells agreed not to submit AMIC's aggregate property losses, and then did not submit them until years after the Lloyd's policy had terminated. Alliant relied on AMIC's and Wells's misrepresentations regarding the Gentlemen's Agreement, as well as AMIC's own lack of action in submitting these claims, and did not submit these losses to Lloyd's until years after the expiration of the Lloyd's policy when Wells apparently changed his mind about the Gentlemen's

Agreement. As such, AMIC is estopped and barred from pursuing its claim in this action against Alliant as to the Lloyd's losses on various legal and equitable grounds. In addition, Alliant is entitled to recover its damages – the costs and expenses of defending this claim – based upon AMIC's fraudulent statements regarding the operation of the Gentlemen's Agreement.

Moreover, as to the Lloyd's losses, AMIC has squarely failed to mitigate its damages since it never sued Lloyd's nor sought arbitration against Lloyd's for payment of those losses. Similarly, it has never sued nor pursued arbitration against Kemper or Discover Re for the alleged damages resulting from the claimed late payments by those companies.

5. STIPULATIONS BY AND BETWEEN THE PARTIES

(a) Alabama Municipal Insurance Company (AMIC) is a not-for-profit mutual insurance company that was established by Alabama's local governmental entities – including cities, towns, utilities, and other municipal associations. AMIC's principal place of business is in Montgomery, Alabama.

(b) Alliant is an insurance services company with its principal place of business in California.

(c) Alliant was formerly known as Driver Alliant Insurance Services, Inc., and as Robert F. Driver Associates before that.

(d) AMIC was paid for primary layer aggregate property loss claims as follows:

| | | |
|---|---|---|
| 2001/2002: | D003F0007 and | $75,496.50 |
| | (paid on or about Aug. 8, 2008) | |
| | 3XZ 162352 00 | $75,496.50 |
| | (paid on or about Aug. 6, 2008) | |
| 2002/2003: | D003R00028 | $661,446 |
| | (paid on or about Jan. 15, 2009) | |
| 2003/2004: | D0003R00034 | $197,451 |
| | (paid on or about Jan. 15, 2009) | |
| 2004/2005: | D0003R00040 | $271,114 |
| | (paid on or about Feb. 15, 2009) | |
| | **TOTAL PAID:** | **$1,281,004** |

It is ORDERED that:

9

1.      The jury selection and trial of this case, which is to last three days, is set for **March 14, 2011**, at 10:00 a.m., in Courtroom 2E of the Frank M. Johnson, Jr., United States Courthouse, 1 Church Street, Montgomery, Alabama.

2.      If there is more than one case to be tried, a trial docket will be mailed to counsel for each party approximately one week prior to the start of the trial term.

3.      The parties shall file any requested voir dire questions, motions in limine fully briefed, and proposed jury instructions and proposed verdict forms with legal citations, on or before **February 28, 2011**.  The opposing party is DIRECTED to file a response to any motion in limine on or before **March 6, 2011**.

4.      The parties are not required to file trial briefs, but if they choose to do so, the briefs shall be filed on or before **February 28, 2011**.

5.      The parties shall jointly prepare and submit to chambers on or before **February 28, 2011**, three copies of a three-ringed binder of pre-marked exhibits.  The binder shall contain joint exhibits (*i.e.*, those exhibits that are relevant, not subject to objections, and certain to be introduced at trial); Plaintiff's exhibits that are or may be contested; and Defendant's exhibits that are or may be contested.  On the same date, the parties shall jointly prepare and submit to chambers three copies of the exhibit list, which shall delineate all objections to exhibits and responses to objections.  The parties shall direct questions about this procedure to the law clerk assigned to the case.

6.      The parties shall review and comply with the Middle District of Alabama's Order on the E-Government Act.

7. All deadlines not otherwise affected by this order will remain as set forth in the Uniform Scheduling Order.

8. The parties have indicated that there are no other disputes at this time. All understandings, agreements, deadlines and stipulations contained in this Order shall be binding on all parties unless modified by the court.

DONE this 8th day of February, 2011.

       /s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE