IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ALABAMA MUNICIPAL | ) |
| INSURANCE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:09-CV-928-WKW [WO] |
| | ) |
| ALLIANT INSURANCE SERVICES, | ) |
| INC., formerly known as DRIVER | ) |
| ALLIANT INSURANCE SERVICES, | ) |
| formerly known as ROBERT F. | ) |
| DRIVER ASSOCIATES, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Not much is simple about this jury case, but these facts are undisputed.

Plaintiff Alabama Municipal Insurance Corporation ("AMIC") was formed as a non-profit corporation by the Alabama League of Municipalities to provide insurance for Alabama municipalities and other public entities. In 2000, AMIC was in the market for reinsurance. Defendant Alliant Insurance Services, Inc. ("Alliant") had for sale to public entity insurers like AMIC a reinsurance program ("PEPIP"), underwritten by various underwriters, including Lloyd's of London ("Lloyd's"). In April and May, 2000, Alliant and AMIC got together (through AMIC's now-President, Steve Wells,

and Alliant's then-Vice President, Gerry Lillis, who were golfing buddies), and AMIC joined the PEPIP program by purchasing a reinsurance policy through the program to reinsure Alabama public entities (cities, towns and the like) with total insured values of roughly $650 million.  (Pl.'s Ex. 3, Property Binder; Abella Trial Test., Mar. 16, 2011.[1])  AMIC and Alliant had no preexisting business relationship.

Alliant issued a PEPIP binder on "various underwriters" (Lloyd's was not identified as the reinsurance carrier initially) to AMIC, and AMIC transmitted a $494,500 premium to Alliant (not Lloyd's).  (Pl.'s Ex. 3; Trial Tr. vol. 1, 50 (Doc. #120).)  The binder required AMIC to report its losses to Alliant, and Alliant promised a written policy to follow.  (Pl.'s Ex. 3, Attach. 3 (stating that coverage is "[a]s per PEPIP USA Manuscript form"); Def.'s Ex. 6, PEPIP USA Manuscript 38 (stating that notice of loss is to be reported to Alliant).)  In fact, no policy was received by AMIC until June 2001, more than a year after its purchase, when the Lloyd's policy (Def.'s Ex. 6) was delivered.  According to AMIC, it also entered into a contractual relationship with Alliant whereby AMIC's duties were to transmit the reinsurance premiums to Alliant, as well as to transmit *timely* its notices of loss to

---

[1]  The court does not have the benefit of a transcript of all testimony.  The testimony of Mr. Wells and Mr. Martin is transcribed and will be referred to as Trial Transcript, volumes 1, 2 and 3, which have been filed.  All other citations to trial testimony, including Mr. Abella's and Mr. Wozniak's testimony, will be from the court's notes.

Alliant. (Am. Compl. ¶ 6 (Doc. # 17)[2]; Trial Tr. vol. 1, 18, 22–23.) In turn, Alliant's alleged contractual duties were to forward *timely* those notices of loss and premiums upstream to the reinsurer(s). (Am. Compl. ¶ 5; Trial Tr. vol. 1, 49–50.) This alleged contract is at the center of this controversy.

Because the 2000–01 premium and aggregate deductible quoted to AMIC were so "aggressive," "competitive" and "low" – in other words, quite favorable and quite cheap – AMIC thrived and grew fatter than a pig with a thyroid condition during the 2000–01 term of the Lloyd's policy. (Trial Tr. vol. 1, 21–22; Abella Trial Test.) During a round of golf in August 2001, Mr. Wells told Mr. Lillis and Mr. Wozniak (also a Vice President at Alliant) that AMIC would not submit reinsurance claims for the 2000–01 "treaty" year.[3] Both parties and their principals referred to this statement as the "Gentlemen's Agreement." Whether it was a legally binding agreement or not, it was never reduced to writing.

In accordance with the Gentlemen's Agreement, AMIC did not submit its 2000–01 claims for more than five years after the end of the Lloyd's policy term.

---

[2] The amended complaint was offered into evidence at trial as Defendant's Exhibit 2.

[3] Mr. Wells also adds, "as long as [Alliant] continued to treat us fairly," but that particular fact is disputed. (Trial Tr. vol. 2, 22 (Doc. # 121); Wozniak Trial Test., Mar. 15, 2011 (stating that "you treating me fairly never came up once").)

3

That was in November, 2006,[3] when Mr. Wells unilaterally decided that AMIC was not being treated fairly by Alliant in its dealings for treaty years subsequent to 2000–01 (years which did not involve Lloyd's – AMIC was insured by other reinsurers during those years).  The 2000–01 claims were eventually submitted through Alliant to  Lloyd's, whose laywer indicated in correspondence in 2009 that Lloyd's would not pay, not because the claims were untimely, but because AMIC's insured values had doubled during the treaty year and no corresponding premium was paid.  Lloyd's is not a party, and its position has never been tested by AMIC.

Contract questions come to the surface like so many boulders.  Was there a meeting of the minds between AMIC and Alliant in the first relevant instance, that back in 2000, Alliant agreed to timely transmit notices of loss to Lloyd's?  If so, did AMIC subsequently agree not to pursue notices of loss with Lloyd's through Alliant, ostensibly under the Gentlemen's Agreement?  And if the Gentlemen's Agreement was in fact no legal agreement at all (owing to lack of consideration and mutuality) or unenforceable (due to the statute of frauds), did the parties' conduct (particularly AMIC's delay of more than five years in bringing claims under the Lloyd's policy) create an equitable bar to enforcement of the alleged contract as a matter of law?

---

[3] This date is also disputed.

4

As is apparently customary in the insurance business, AMIC and Alliant did not bother their lawyers with requests for pre- or post-nuptial agreements defining their roles and obligations in this marriage. In fact, it turns out there might not even be a marriage at all between AMIC and Alliant. Alliant says it brokered a marriage between AMIC and Lloyd's, and that it was merely the priest who performed the ceremony. AMIC says it thought it was marrying Alliant *and* Lloyd's. To paraphrase Shakespeare, one must here admit impediments to the marriage (meeting) of true corporate minds.[4] It has fallen to unfortunate lawyers, a judge and jury to sort it out, and here we are.

A jury trial ensued, and Alliant now seeks post-trial relief from a jury verdict in favor of AMIC for $392,429.00 on AMIC's breach of contract claim. Before the court is Alliant's fully-briefed Renewal of Motion for Judgment as a Matter of Law, or Alternatively that Judgment be Vacated, filed pursuant to Federal Rule of Civil Procedure 50(b). (*See* Docs. # 118, 123, 126.) For the reasons set forth below, Alliant's motion is due to be granted, and judgment will be entered in favor of Alliant as a matter of law.

---

[4] William Shakespeare, *Sonnet 116*.

5

## II. STANDARD OF REVIEW

Rule 50(b) of the Federal Rules of Civil Procedure allows a party to "renew its motion for judgment as a matter of law after the jury has returned its verdict, if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1251 (11th Cir. 2007); Fed. R. Civ. P. 50(b). "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict . . . ; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

"The standard for judgment as a matter of law mirrors that of summary judgment . . . ." *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006) (citing *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Construing the evidence submitted to the jury in the light most favorable to the non-moving party, *see Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (summary judgment context), the court "consider[s] whether such sufficient conflicts exist[ ] in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that that party is entitled to succeed in his or her position as a matter of law." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (*en banc*)). As with summary judgment, "the non-movant must put forth more than a

6

mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Id.*

"A motion for judgment as a matter of law will be denied only if 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.'" *Mendoza*, 195 F.3d at 1244 (quoting *Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995)).  At the same time, "'[i]f the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion [is due to be] granted.'" *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997)); *see also Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1347 n.5 (11th Cir. 2007) ("Judgment as a matter of law 'is appropriate when a plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action.'" (quoting *Christopher v. Fla.*, 449 F.3d 1360, 1364 (11th Cir. 2006)).  In sum, the jury's commission is to dutifully apply the law to the evidence adduced at trial, and if that application is determined unreasonable, as defined above, then the court may direct the entry of judgment as a matter of law.

## III.  PROCEDURAL BACKGROUND

AMIC filed an Amended Complaint against Alliant alleging one breach of contract count for Alliant's alleged failure to perform contractual obligations relating

to one reinsurance policy that Alliant obtained for AMIC in 2000.  There is much confusion surrounding the nature of the relationship between AMIC and Alliant.  In the Amended Complaint, AMIC uses the term "Managing General Agent" ("MGA") fifteen times to describe Alliant.  The Amended Complaint alleges eight times that Alliant was an MGA "for" AMIC, and fourteen times refers to an "MGA contract" or to Alliant's alleged "contractual duties as MGA."  (Am. Compl. ¶¶ 4–40 (Doc. # 17).)  Although capitalized upon its first appearance, the term is nowhere defined in the Amended Complaint, and nowhere is there reference to the Alabama Managing General Agents Act, Ala. Code § 27-6A-1, *et seq.*  Alliant has taken the position in its briefing that it "served as a broker to procure reinsurance policies for AMIC[.]" (Def.'s Br. in Supp. of Rule 50(b) Mot. 7 (Doc. # 118).)

A jury trial was held from March 14 through March 17, 2011.  The jury found that AMIC and Alliant entered into a contract, that it was an MGA contract, and that Alliant breached the contract.  The jury then rejected Alliant's defenses of equitable estoppel, laches and statute of frauds.   The jury awarded AMIC $392,429.00. (Verdict Form (Doc. # 104).)

Alliant has renewed its motion for judgment as a matter of law made at the close of AMIC's case and at the close of evidence, arguing that the jury's verdict is unsupported factually and legally.  Specifically, Alliant argues:  (1) that the jury's

finding of an MGA contract was unreasonable and that AMIC failed to meet its burden of proving the elements of its breach of contract claim; (2) that AMIC's breach of contract claim is barred by Alabama's Statute of Frauds, Ala. Code § 8-9-2; and (3) that AMIC's breach of contract claim is barred by Alliant's defenses of laches and equitable estoppel.  (Def.'s Br. in Supp. of Rule 50(b) Mot. 4.)  Alliant seeks entry of judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).

## IV.  DISCUSSION

Several grounds exist for granting Alliant's Rule 50(b) renewed motion for judgment as a matter of law.  First, there is no legally sufficient evidentiary basis to support the jury's finding that the parties entered into an MGA contract, and that alone perhaps would warrant relief.  Second, however, exclusive of the MGA contract claim, the court also finds that AMIC failed to prove any breach of contract claim. Third, and finally, even if AMIC proved a binding contract with Alliant, the court further finds that Alliant would be entitled to judgment as a matter of law on its statute of frauds and equitable estoppel defenses.

## A.    __AMIC's Burden of Proof on the Alleged Contract__

In response to Questions 1, 2 and 3 of the Verdict Form, the jury found "by a preponderance of the evidence that AMIC and Alliant entered into a contract to procure reinsurance and transmit reinsurance claims[,]" that the contract was an

"[MGA] contract[,]" and that "Alliant breached the [MGA] contract[.]"  Alliant contends that the jury's finding of any contract at all, and in particular an "MGA contract," was unreasonable and contrary to the evidence.  Alliant further argues that AMIC failed to prove the elements of its breach of contract claim.

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff['s] performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009).  "The requisite elements of a valid contract include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of the contract." *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1118 (Ala. 2003) (citations, brackets and internal quotation marks omitted); *see also Macon Cnty. Greyhound Park, Inc. v. Knowles*, 39 So. 3d 100, 107 (Ala. 2009).

AMIC contends that, pursuant to the alleged MGA contract, Alliant owed AMIC *duties*[5] to bind coverage and to timely transmit claims and premiums to the

---

[5] The court suspected throughout the trial, and after reflection is convinced, that this case is really about Alliant's duty of care sounding in tort.  The fact that Alliant's alleged contractual duty happens to be identical to its duty of care as, say, a broker, is perhaps not coincidence.  Alabama's statute of limitations for tort actions is two years. *See* Ala. Code § 6-2-38(l).  On the other hand, Alabama's statute of limitations for breach of contract is a more generous six years. *See* Ala. Code § 6-2-34(4).  In this case, a breach of duty cause of action sounding in tort likely would have been barred by the two-year statute of limitations.

reinsurer.[6]  (Am. Compl. ¶ 5 (Doc. # 17); Pl.'s Resp. to Def.'s Rule 50(b) Mot. 5–6 (Doc. # 123); Trial Tr. vol. 1, 18 (Wells's testimony that Alliant's contractual obligations were to "[p]rovide the reinsurance through their PEPIP program and to do whatever it takes to get our claims paid")).)  According to AMIC, its own contractual obligations were to timely submit the reinsurance premiums to Alliant for transmission to the reinsurer and to timely notify Alliant of any losses suffered that were covered by the reinsurance policies.  (Am. Compl. ¶ 6; Trial Tr. vol. 1, 18 (testifying that AMIC's contractual obligations were to "submit quarterly reports, whether it was claims or values, and submit those in a – you know, straight to them so they could do their job, basically").)

### 1.    No MGA Contract Between Alliant and AMIC

The first problem with the verdict is the jury's finding that Alliant and AMIC entered into an MGA contract.  The Amended Complaint states a multitude of times that Alliant "act[ed] as a[n] [MGA] *for* AMIC . . . ."  (*See, e.g.*, Am. Compl. ¶¶ 4, 7, 10, 13, 16, 22, 28, 34 (emphasis added).)  Count I of the Amended Complaint

---

[6] AMIC alleged breaches with respect to multiple policies from multiple policy years in the Amended Complaint.  At trial, AMIC pursued only Alliant's alleged breach with regard to the 2000–01 reinsurance policy with Those Various Underwriters of Lloyd's of London ("Lloyd's").  AMIC abandoned the other alleged breaches and now concedes that Alliant "performed" its alleged contractual duties for those policy years.  (Pl.'s Resp. to Def.'s Rule 50(b) Mot. 5–6.)  Thus, at issue is only one breach regarding one reinsurance policy.

11

unambiguously avers that "Alliant and AMIC entered into an MGA contract" and that "Alliant is in breach of the MGA contract . . . ."  (Am. Compl. ¶¶ 38, 40.)

However, at trial, AMIC largely changed its tune.  Alliant was no longer an MGA for AMIC, but was an MGA for the reinsurers.  Contradicting the allegations of the Amended Complaint, Steve Wells, President and CEO of AMIC, testified with emphasis numerous times that Alliant was an MGA for the reinsurers – *not for AMIC*. In response to Alliant's counsel's question, "But I thought you said [Alliant] was the MGA for AMIC[,]" Mr. Wells responded:  "Never said that."  (Trial Tr. vol. 1, 46.) A few moments later, Mr. Wells testified that "because [Alliant] was the MGA on the PEPIP program for [Lloyd's], they had the pen."  (Trial Tr. vol. 1, 51.)  Mr. Wells continued:  "Again, Alliant was the MGA for the Lloyd's of London policies."  (Trial Tr. vol. 1, 56.)  "[T]here's [sic] various reinsurance companies that they have underwritten through *their MGA agreement with those companies*, yes."  (Trial Tr. vol. 1, 59 (emphasis added).)  And finally, this exchange took place in the context of a discussion regarding payment of Alliant's commission:

Q:  All right.  Who determined what that commission was going to be?
A:  I believe Alliant did.
Q:  With who?
A:  With the reinsurers.
Q:  And they never came to you and sat down and y'all dickered over what the commission was going to be, did they?

A:  No, *which sort of proves my point that they were the MGA for the reinsurers, not us.*  So—

Q:  All right.  They were the MGA for the reinsurers but not you.  Is that what you're saying?

A:  That's correct.

Q:  They were not an MGA for – I just want to make sure I got this right.  They were not an MGA for AMIC.

A:  That is correct.

(Trial Tr. vol. 1, 63–64 (emphasis added).)

Mr. Gary Martin, AMIC's expert, testified similarly, albeit less directly.  After testifying that Alliant was an MGA (but not for whom) and describing the role of the MGA, Mr. Martin defined an MGA as "a wholesaler that's *representing a carrier* in the marketplace and producing retail customers to have the carrier's capacity purchased."  (Trial Tr. vol. 3, 44 (Doc. # 122) (emphasis added).)  In the context of this case, AMIC is the "retail customer" and Alliant is the "wholesaler."  Based on his definition, Mr. Martin clearly envisioned an MGA relationship between Alliant and the reinsurer, not AMIC.  This is further buttressed by his earlier testimony in which he presupposes an MGA relationship prior to a reinsured (*i.e.*, AMIC) entering the picture.  (Trial Tr. vol. 3, 10 ("Often an MGA will establish a program that makes it more conducive for [it] to go out and attract retail placements to basically place business into the carrier's risk – risk bank, if you will.").)

Finally, Tony Abella, Jr., AMIC's retained broker from Arthur J. Gallagher & Co. ("Gallagher"), testified consistently with Mr. Wells and Mr. Martin. Mr. Abella testified on direct examination that Alliant was a general agent or MGA (using the terms interchangeably), but not for anyone in particular. However, he clarified his position on cross-examination, testifying that the managing general agency contract would be the agreement between the underwriters and the managing general agent. This testimony wholly excludes AMIC from the MGA contract. Though Mr. Abella's testimony on direct examination might have provided an inadequate scintilla of evidence that the contract pled was an MGA contract, the sum of his testimony is that Alliant was not an MGA for AMIC.

Thus, in contradiction to the Amended Complaint and to the jury's response to Question 2 of the Verdict Form, there was no testimony or other evidence to support an MGA contract between Alliant and AMIC. Recognizing its changed theory of the case and the lack of evidence supporting an MGA contract between AMIC and Alliant, AMIC filed a Motion to Amend the Pleadings to Conform to the Evidence after it rested on March 16, 2011. (Doc. # 96.) In that motion, AMIC unveiled its new theory of the case: "AMIC's theory [is] that a contract other than the written MGA contract was breached by Alliant." (Mot. to Amend 2.) That motion was later denied as moot (Doc. # 107) in light of the jury's response to Question 2 of the

14

Verdict Form, in which the jury found that the contract at issue between Alliant and AMIC was an MGA contract.[7]   The complete lack of evidence from either party in support of an MGA contract between Alliant and AMIC renders the jury's response to Question 2 of the Verdict Form unreasonable and contrary to the evidence.   Based upon this result, the court would be inclined to grant Alliant relief, but there are more serious problems with the verdict.

###    2.    *The Contract AMIC Sought to Prove at Trial Is Indefinite*

A more consequential hindrance to sustaining the jury's verdict is the necessary conclusion that AMIC's evidence is hopelessly indefinite and fails to establish a valid contract as a matter of law.   In its Response to Alliant's Motion for Judgment as a Matter of Law, AMIC now argues that Defendant's Exhibit 6 – the PEPIP Manuscript that is part of the reinsurance policy itself – is the contract between AMIC and Alliant.   (Pl.'s Resp. to Def.'s Rule 50(b) Mot. 4–5 (section titled "A.   A Valid Binding Contract Existed:    The PEPIP Manuscript" and multiple citations to

---

[7] On account of the absence of testimony to support an MGA contract between AMIC and Alliant, the court's initial set of charges would have instructed the jury not to concern itself with whether the alleged contract was an MGA contract, and there would have been no Question 2 on the Verdict Form.   Alliant objected, arguing that the jury should decide whether the contract was an MGA contract because that was what AMIC pleaded in the Amended Complaint.   The objection of Alliant resulted in changed Jury Instructions and Verdict Form.   Neither party objected to the court's final set of Jury Instructions and Verdict Form, which charged the jury to determine whether there was a contract, and if so, whether it was an MGA contract.   Reasonable and fair-minded persons could not conclude that the contract was an MGA contract between these parties.

Defendant's Exhibit 6).)  In fact, the testimony of Mr. Wells was that Alliant agreed to "do whatever it takes to get our claims paid." (Trial Tr. vol. 1, 18.)  That language appears nowhere in writing in the evidence – specifically not in the manuscript AMIC now claims as the contract.  Under cross examination, Mr. Wells was asked:  "Q. My question is, do you have any piece of paper or contract that you can point to that says that Alliant had to timely submit claims on behalf of AMIC?  A.  No, I do not." (Trial Tr. vol. 2, 10.)  Nor did Mr. Wells attribute the promise to any particular statement by a person binding Alliant.

"Any contract must express all terms essential to the transaction with definiteness sufficient to enable a court to enforce the parties' agreement." *Macon Cnty. Greyhound Park, Inc.*, 39 So. 3d at 108 (citing *White Sands Grp., L.L.C. v. PRS II, LLC*, 998 So. 2d 1042, 1051 (Ala. 2008)).  "[A] contract that 'leav[es] material portions open for future agreement is nugatory and void for indefiniteness.'" *Id.* (quoting *White Sands Group*, 998 So. 2d at 1051).  A reservation by either party "'of a future unbridled *right to determine the nature of the performance* . . . has often caused a promise to be too indefinite for enforcement.'" *White Sands Group*, 998 So. 2d at 1051 (quoting 1 Richard A. Lord, Williston on Contracts § 4:21, at 644–48 (4th ed. 2007)).  Moreover, indefiniteness "may render a contract void for lack of mutuality of obligation," *id.* at 1051 (internal alterations and quotation marks

16

omitted), and whether a contract fails for indefiniteness is properly a question of law for the court to decide, *id.* at 1052–53.

AMIC has argued that the written PEPIP manuscript is the contact between AMIC and Alliant, or that the contract was implied based upon the written PEPIP manuscript, as well as industry standards and the course of dealing between the parties, and on occasion that the binder (Pl.'s Ex. 3) was part of the contract. Based on the evidence before the court, however, there is no legally sufficient basis to find the existence of a clear and definite contract or a breach thereof. There is no "ever-fixed mark," leaving the court now, as it was at trial, a "wandering bark" in search of the elusive contract.[8] AMIC failed to prove the contract with Alliant.

### 3.    *AMIC Failed to Prove Its Own Performance Under the Contract*

Assuming for purposes of argument that the PEPIP manuscript was the contract between AMIC and Alliant, one of the elements a plaintiff must prove on a breach of contract claim is its own performance under the contract. *Shaffer*, 29 So. 3d at 880. According to AMIC's alleged contract with Alliant, its contractual obligation regarding transmission of claims was to *timely* notify Alliant of any losses suffered that were covered by the 2000–01 Lloyd's reinsurance policy. (Am. Compl. ¶ 6; Trial Tr. vol. 1, 18.) The Claims Control Clause plainly states: "[I]t is a condition

---

[8] Shakespeare, *supra* note 4.

precedent to any liability under this Certificate that a) The Reinsured shall, upon knowledge of any loss or losses which may give rise to a claim against this Certificate, advise the Reinsuring Underwriters thereof *as soon as possible.*" (Def.'s Ex. 6, Proportional Reinsurance Certificate 3 (emphasis added).)  Moreover, the Notice of Loss Clause says:  "In the event of loss or damage insured against under this Policy, *the Insured shall give immediate notice . . . .*" (Def.'s Ex. 6, PEPIP USA Manuscript 38 (emphasis added).)  Finally, the Proof of Loss paragraph states: "The Insured shall render a signed and sworn proof of loss *as soon as practical* after the occurrence of a loss, . . ."  (Def.'s Ex. 6, PEPIP USA Manuscript 40 (emphasis added).)  AMIC's submission of claims, under all the circumstances, was not timely as a matter of law.

> ### a.   Under Agency Principles, the Claims Were Not Submitted by AMIC in February 2005 as a Matter of Law

Mr. Abella testified that he, as AMIC's broker and agent, first submitted AMIC's claims on the Lloyd's 2000–01 policy on February 2, 2005, when he sent to Doug Wozniak by email a spreadsheet with AMIC's final aggregate loss reports. (Abella Trial Test. (testifying that "the first numbers . . . that got the clock ticking on the 2000–2001 [policy] . . . were submitted in February of '05"); (Trial Tr. vol. 1, 32–33 (Mr. Wells affirming that in February, 2005, Mr. Abella submitted loss reports

to Alliant.)  However, Mr. Wells had proposed to and entered into a Gentlemen's Agreement with Alliant in August 2001, whereby AMIC agreed that it never would submit claims under the Lloyd's policy so long as Alliant treated AMIC fairly.[9]  (Trial Tr. vol. 2, 22.)  Regarding the Gentlemen's Agreement, Mr. Wells testified that he did not call off the Gentlemen's Agreement until November 2006, about twenty months after Mr. Abella first submitted the claims.  (Trial Tr. vol. 1, 37; Trial Tr. vol. 2, 24.) Indeed, AMIC admits in briefing that the Gentlemen's Agreement "was cancelled by the parties to the agreement in November 2006."  (Pl.'s Resp. to Def.'s Mot. for J. As a Matter of Law 9 (Doc. # 98).)  Accordingly, as of February 2005, it is undisputed that Alliant was getting mixed signals from AMIC itself and from AMIC's agent, Mr. Abella.  On the one hand, Mr. Abella prepared claims under the Lloyd's policy in the form of a final loss report to Alliant.  On the other hand, Mr. Wells had told Alliant that he likely never would submit claims under the Lloyd's policy, and that agreement

---

[9]  To be clear, the arrangement referred to as the "Gentlemen's Agreement" is not deemed an agreement at all.  The court uses the lexicon of the parties' throughout their decade of dealing, including this trial, as shorthand for the explanation why AMIC waited so long to submit its claims under the 2000–01 Lloyd's policy.  At bottom, the Gentlemen's Agreement is construed as AMIC's unilateral waiver of rights it possessed under a reinsurance policy underwritten by Lloyd's.  AMIC attempts to make that waiver conditional on "so long as Alliant treated AMIC fairly."

was still in effect in February 2005, when Mr. Abella first attempted to submit those claims.[10]

Several agency issues arise, and ultimately lead the court to conclude that *AMIC* did not submit to Alliant its claims on February 2, 2005, as a matter of law.[11] The first issue is whether Mr. Abella was acting within the scope of his agency authority on February 2, 2005, when he first attempted to submit AMIC's final loss report and claims to Alliant. Mr. Abella testified that, at the time, he was aware that AMIC and Alliant had a Gentlemen's Agreement in force whereby AMIC would not submit claims, and that he submitted them anyway. (Abella Trial Test. ("Well, in the insurance world, the only thing I can go by is the actual written contract. . . . [W]hen I called Doug [Wozniak at Alliant] to tell him that we were going to be filing aggregate claims before that February filing, that's when he commented, hey there's that agreement in place. And I said, Doug, I'm sorry. . . . I've got no choice [other] than to file an entire aggregate recovery.").) Mr. Abella also testified that his actions in submitting the claims were self-serving to a degree. (Abella Trial Test. ("Q: And you said one of the reasons you didn't rely on the Gentlemen's Agreement and Mr.

---

[10]  For a discussion of Alliant's reliance on the representations of AMIC regarding the Gentlemen's Agreement, see Section IV.B.2 *infra*.

[11]  Waiting until February, 2005, to submit claims on a 2000–01 policy is untimely, but is not the primary factual support for finding a failure of performance by AMIC.

Wells's representations [was] because that would have put Arthur J. Gallagher at risk; is that correct? . . . A:  If we were a party to it, it certainly might have.").)

The Restatement (Third) of Agency recognizes two forms of agency authority: actual and apparent.  The inquiry here is simply whether the agent, Mr. Abella, was acting within the scope of his actual authority.  "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."  Restatement (Third) of Agency § 2.01 (2006); *see also G.UB.MK Constructors v. Garner*, 44 So. 3d 479, 486 (Ala. 2010) (citing the Restatement (Third) of Agency with approval).  Based upon Mr. Abella's prior knowledge of the Gentlemen's Agreement, AMIC's outward manifestations concerning the agreement, and Mr. Abella's knowledge that the Gentlemen's Agreement was still in effect on February 2, 2005, Mr. Abella's submission of the 2000–01 Lloyd's claims was outside his actual authority.

In a March 9, 2004 email sent by Mr. Abella to Mr. Wozniak and Mr. Wells, among others, Mr. Abella referenced the Gentlemen's Agreement:  "I believe there was a gentleman's agreement between Steve Wells and Gerry Lillis that AMIC would not pursue an aggregate recovery for this [2000–01 Lloyd's policy] year.  (If Gerry and Steve [c]ould please confirm their recollection of this I would be most

21

appreciative)." (Def.'s Ex. 16, 3/9/2004 Email from Abella to Wozniak, *et al.*) Thus, at least as of March 9, 2004, this email reveals that AMIC's manifestations to Mr. Abella were that there was a Gentlemen's Agreement in effect and that, pursuant to the agreement, AMIC would not submit claims under the 2000–01 Lloyd's policy.[12] Accordingly, as of March 9, 2004, Mr. Abella could not have reasonably believed that AMIC wished him to submit AMIC's 2000–01 Lloyd's claims for payment based upon the Gentlemen's Agreement. And nothing up to February 2, 2005, appears to have changed this understanding of the Gentlemen's Agreement. Mr. Wells testified that the Gentlemen's Agreement was still in effect as of February 2, 2005 (in fact, that it was still in effect until twenty months later). (Trial Tr. vol. 1, 36–37; Trial Tr. vol. 2, 24.) Furthermore, Mr. Abella testified that when he attempted to submit the February 2, 2005 claims, he deliberately chose not to rely on the Gentlemen's Agreement, which he understood to be in force, and that he even acted according to his own interests in submitting the claims. (Abella Trial Test.) As of February 2, 2005, Mr. Abella could not have "reasonably believe[d] . . . that the principal [AMIC] wishe[d] [him] so to act" in submitting the 2000–01 Lloyd's policy claims. Restatement (Third) of Agency § 2.01.

---

[12] In fact, Mr. Abella testified that he was present at the time the Gentleman's Agreement was made in August 2001. (Abella Trial Test. ("Well, I was certainly there.").)

Nevertheless, by adopting the February 2, 2005 date in litigation as the date AMIC first submitted its claims, AMIC seeks to ratify Mr. Abella's actions. "A ratification of a transaction is not effective unless it precedes the occurrence of circumstances that would cause the ratification to have adverse and inequitable effects on the rights of third parties." Restatement (Third) of Agency § 4.05. One such situation where a ratification is not effective involves "any material change in circumstances that would make it inequitable to bind the third party . . . ." Restatement (Third) of Agency § 4.05(2). Rescinding the Gentlemen's Agreement almost twenty months after the claims were known and filing a lawsuit claiming breach of contract for the alleged *untimely* submission of claims based upon the February 2, 2005 date is a material change that would make it inequitable to bind Alliant to AMIC's attempted ratification of the February 2, 2005 date. Thus, AMIC cannot be said to have submitted its claims to Alliant on February 2, 2005, as a matter of law.

### b.   AMIC's October/November 2006 Submission Was Untimely

Mr. Abella testified that the second time he submitted AMIC's claims to Alliant was on October 30, 2006, just before or around the time that AMIC called off the Gentlemen's Agreement. (Abella Trial Test. ("Q: And we next go in our timeline

– and that's the 10/30/2006 e-mail.  This is your formal request.  A:  Oh, yes sir.  Q: And again, Tony, don't let me misquote you, but your formal request really isn't different [from] the request you made 18 months earlier [on February 2, 2005].  A: No.  It was just an attempt to try and get more attention to it.").)  Accordingly, it is from this date, six years after the binder was issued, five years after the policy term ended, and twenty months after Mr. Abella first attempted to submit AMIC's claims, that the jury was to assess whether AMIC's own performance under the alleged contract was timely.

Although there was a significant amount of testimony that the 2000–01 Lloyd's policy was an indemnity contract and that the final settlement of a claim subject to the public procurement process could take years (*see e.g.*, Abella Trial Test.), the court concludes that the October 30, 2006 submission was untimely as a matter of law and that AMIC failed to prove its own performance under the contract.  The court reaches this conclusion *not only* because five years elapsed between the end of the policy term and the submission of the claims by AMIC, but also because AMIC had claims ready to be submitted as of February 2, 2005.  Despite having claims ready to be submitted, AMIC waited another twenty months, until Mr. Wells decided unilaterally to rescind the Gentlemen's Agreement, to finally submit them.

To draw from the related context of submitting notice of losses to an insurer under an insurance policy, the Alabama Supreme Court has held that delays of submitting claims of one year, eight months, and six months are unreasonable as a matter of law.  *See Fire Ins. Exch. v. McCoy*, 637 F. Supp. 2d 991, 993–94 (M.D. Ala. 2009) (collecting Alabama Supreme Court cases).  There is no material difference between untimely submission of claims by an insured to an insurer and by a reinsured to a reinsurance intermediary to be submitted to a reinsurer.[13]  Accordingly, the court concludes that AMIC's delay of more than five years in submitting the claims, including its twenty-month delay after the claims were ready,  is unreasonable and untimely as a matter of law.  No reasonable juror could have found that AMIC proved its own performance under the alleged contract.

### 4.    *The Statute of Frauds Bars Recovery*

Section 8-9-2 of the Code of Alabama states that "[e]very agreement, which by its terms, is not to be performed within one year from the making thereof" is "void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith."

---

[13]  If anything, a reasonable time to submit claims to a reinsurance intermediary is more time-restrictive because the intermediary must also have time to submit the claims upstream to the reinsurer.

There must be a "valid oral contract . . . of which the memorandum is an accurate statement." *Fausak's Tire Ctr., Inc. v. Blanchard*, 959 So. 2d 1132, 1139 (Ala. Civ. App. 2006) (citing 10 R. Lord, Williston on Contracts §§ 29:6 at 434 (4th ed. 1999)). For reasons noted elsewhere in this Opinion, AMIC has not established a writing binding Alliant in any respect to "do whatever it takes to get our claims paid." (Trial Tr. vol. 1, 18.)  Nor has AMIC established such a promise by oral agreement.  The proof of a binding, enforceable contract is therefore doubly lacking.[14]

### 5.    *AMIC Failed to Prove Damages*

As an element of AMIC's breach of contract claim, AMIC had the burden of proving that it suffered damages as a result of Alliant's alleged breach regarding the timely submission of AMIC's claims.  Alliant contends that AMIC failed to meet this burden because it did not prove that late notice was the reason Lloyd's did not pay the claim.

"[D]amages recoverable for breach of contract are those which result naturally and proximately from the breach." *Marshall Durbin Farms, Inc. v. Landers*, 470 So. 2d 1098, 1102 (Ala. 1985).  "The finding of a causal relation [between the breach and the damages] must be based on more than surmise or conjecture." *Cooley v. Gulf*

---

[14] Assuming for argument only the existence of a binding, enforceable contract, AMIC has not shown that the contract could have been performed within one year of its making.

26

*Bank, Inc.*, 773 So. 2d 1039, 1047 (Ala. Civ. App. 1999); *see also* Restatement (Second) of Contracts § 352 ("A party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with *reasonable certainty*." (emphasis added)).  Rather, "[t]he causal relation must be established by a 'but for' link between the defendant's conduct and the plaintiff's loss." *Cooley*, 773 So. 2d at 1047 (citing *Corson v. Universal Door Sys., Inc.*, 596 So. 2d 565, 570 (Ala. 1991)).

AMIC had the burden of proving that Alliant's alleged breach of failing to timely submit AMIC's claims proximately caused Lloyd's refusal to pay AMIC's claims.  *Marshall Durbin Farms*, 470 So. 2d at 1102.  The only evidence submitted to the jury regarding Lloyd's position is a letter from Lloyd's counsel to AMIC's counsel dated September 28, 2009.  (Def.'s Ex. 86, 9/28/2009 Letter from Lock to Speagle.)  In that letter, counsel for Lloyd's sets forth Lloyd's position in response to AMIC's claims.  During the 2000–01 policy term, AMIC's total insured values doubled from approximately $623 million to approximately $1.3 billion.  Citing AMIC's growth during the policy term, Lloyd's referred to AMIC's obligations under the Automatic Acquisition clause of the Lloyd's policy.  According to Lloyd's reading of the clause, AMIC was required to report "new named insured members" whose total insured values did not exceed $50 million.  (Def.'s Ex. 86, at 3–4; Def.'s

Ex. 6, PEPIP USA Manuscript 87–88.)  For "new named insured members with total insured values exceeding [$50 million][,]" AMIC was to "report[ ] [those members] immediately to [Lloyd's] for acceptance and additional . . . premium agreement." (Def.'s Ex. 86, at 3; Def.'s Ex. 6, PEPIP USA Manuscript 87.)

Based upon these provisions, Lloyd's position was that "[t]o the degree that any new member had total insured values of less than [$50 million], automatic coverage would exist but a premium would be due.  If any new member had total insured values exceeding [$50 million], AMIC was to report these new members to [Lloyd's] immediately for acceptance and an additional premium."  (Def.'s Ex. 86, at 3–4.)  Having taken the position that it was entitled to additional premiums, Lloyd's calculated, based upon the available information, that its additional premium would "more than offset[ ] the amount to which you believe [AMIC] is due."  (Def.'s Ex. 86, at 4.)

Although the correctness of Lloyd's position is disputed, AMIC does not dispute that this, in fact, is Lloyd's position.  (Trial Tr. vol. 1, 46 ("That's [Lloyd's] incorrect position, yes.").)  AMIC's concession that this letter sums up Lloyd's position is important because nowhere in this letter does Lloyd's set forth or even implicate a position that AMIC's claims would be denied for untimeliness.  Other than calling the position "incorrect," AMIC has failed to test Lloyd's position.  If

28

AMIC had filed a lawsuit against Lloyd's, Lloyd's may have asserted a defense of untimeliness of the claims. However, speculation as to whether Lloyd's would have asserted a particular defense is insufficient to create a triable issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (stating in summary judgment context that "[s]peculation does not create a *genuine* issue of fact . . . ."); *see also Thorne*, 448 F.3d at 1266 (stating that the standard for a judgment as a matter of law motion mirrors that of summary judgment); *Cooley*, 773 So. 2d at 1047 ("The finding of a causal relation [between the breach and the damages] must be based on more than surmise or conjecture.").

In sum, the evidence before the jury regarding AMIC's damages was legally insufficient to establish with reasonable certainty a causal relationship between Alliant's alleged breach and Lloyd's refusal to pay AMIC's claims. *See* Fed. R. Civ. P. 50; Restatement (Second) of Contracts § 352. No reasonable juror, based upon the evidence AMIC produced regarding damages, would have been able to conclude that, but for Alliant's alleged failure to timely transmit claims, Lloyd's would have paid AMIC's claims. *Cooley*, 773 So. 2d at 1047 (citing *Corson*, 596 So. 2d at 570). Nor would a reasonable juror, on this evidence, have been able to conclude that Lloyd's conjectured refusal to pay AMIC's claims was a proximate result of Alliant's alleged failure to timely transmit AMIC's claims. *Marshall Durbin Farms*, 470 So. 2d

at 1102.  AMIC thus failed in its burden of showing a causal connection between untimeliness of submission of the claims and the failure to pay the claims.

## B.    Alliant's Equitable Estoppel and Laches Defenses

Alliant's final argument is that no reasonable juror could have found that Alliant did not prove its equitable estoppel and laches defenses by a preponderance of the evidence.  The jury rejected this defense in its response to Question 4 of the Verdict Form.  At issue is the Gentlemen's Agreement the parties discussed during a golf outing in August 2001, during the Lloyd's policy term.  (Wozniak Trial Test., Mar. 15, 2011.)

The elements of the defense of equitable estoppel are:  (1) The person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on; (2) the person seeking to assert estoppel relies upon that communication;  and (3) the person relying would be harmed materially if the actor is later permitted to assert a claim inconsistent with his earlier conduct.[15]  *Gen. Elec. Credit Corp. v. Strickland Div. of Rebel Lumber Co.,*

---

[15]  Although Alliant properly refers to its defense as "equitable estoppel," it recites the elements of the claim of promissory estoppel.  (Def.'s Br. in Supp. of Rule 50(b) Mot. 45–46.)  A claim of promissory estoppel differs from the defense of equitable estoppel in one respect. Equitable estoppel requires the person against whom the estoppel is asserted to have made a *misleading* communication, while promissory estoppel only requires a communication in the

*Inc.*, 437 So. 2d 1240, 1243 (Ala. 1983) (citing *Mazer v. Jackson Ins. Agency*, 340 So. 2d 770, 773 (Ala. 1976)); *see also Hughes v. Mitchell Co., Inc.*, 49 So. 3d 192, 200 (Ala. 2010). "The purpose of equitable estoppel . . . is to promote equity and justice in an individual case by preventing a party from asserting rights . . . when his own conduct renders the assertion of such rights contrary to equity and good conscience." *Mazer*, 340 So. 2d at 772 (citing *First Nat'l Bank of Opp v. Boles*, 165 So. 586, 592 (Ala. 1936)). In other words, the "far reaching" doctrine of equitable estoppel can act to "deny[ ] to a person the right to repudiate his . . . representations, when they have been relied upon by persons to whom they were directed and whose conduct they were intended to and did influence." *Id.* (quoting *Boles*, 165 So. at 592).

---

form of a promise. *See Mazer*, 340 So. 2d at 772 ("Except for the nature of the conduct on which the estoppel is based, the elements of equitable and promissory estoppel are essentially the same."). Alliant was not alone, however, in overlooking this difference. *See Penick v. Most Worshipful Prince Hall Grand Lodge F & A M of Al., Inc.*, 46 So. 3d 416, 430–31 (Ala. 2010) (employing the heading "Promissory Estoppel" but reciting the elements of equitable estoppel). Furthermore, AMIC did not object to Alliant's proposed equitable estoppel jury charge, which erroneously listed the elements of promissory estoppel, and the court itself failed to recognize the problem when it delivered the instruction to the jury. (Doc. # 101, at 10.) Despite the erroneous charge, it can be presumed that the jury would have rejected Alliant's equitable estoppel defense even if charged properly, because the promissory estoppel elements are similar to those of equitable estoppel except for the extra proof in equitable estoppel that the communication be misleading.

## 1.    *Misleading Communication*

The first element of Alliant's equitable estoppel defense requires AMIC to have

made a misleading communication to Alliant with the intention that Alliant rely upon

it.  The parties do not dispute the existence of the Gentlemen's Agreement nor do they

dispute that the Gentlemen's Agreement was Mr. Wells's idea during a golf outing

in August 2001.[16]  (Trial Tr. vol. 2, 22–23 ("Q:  And the [G]entlemen's [A]greement

was your idea, wasn't it?  A:  That is correct."); Wozniak Trial Test. ("Q:  Okay.  And

he proposed [the Gentlemen's Agreement]?   A:   Yeah.   It came from Steve

[Wells].").)

_____

[16] However, the parties do dispute AMIC's reason for proposing the Gentlemen's
Agreement.  Mr. Wells testified that he proposed the Gentlemen's Agreement for marketing
purposes.  (Trial Tr. vol. 2,  22–23; Trial Tr. vol. 1, 29 ("[W]e basically decided to not ask [sic]
for the recovery primarily as a marketing tool.").)  In other words, Mr. Wells thought that by not
submitting claims in his first year, AMIC would present a good loss history and this would result
in lower premium rates in the future.  (Trial Tr. vol. 2, 23.)  Mr. Wozniak saw a different reason
for not submitting the claims under the Lloyd's policy.  Between May 2000 and November 2001
(the duration of the Lloyd's policy), AMIC's total insured values doubled from roughly
$600–650 million to roughly $1.3 billion.  (Abella Trial Test.; Trial Tr. vol. 1, 43 ("Absolutely.
We – we nearly doubled in size [in 2000], property value wise, yes."); Wozniak Trial Test., Mar.
15, 2011 ("The underwriting that took place on day one when that policy was originally placed
on May 1st of 2000 was based on a risk set of $650 million in values.  And then the program
doubled [to $1.3 billion] over the course of 18 months.").)  Alliant's and Mr. Wozniak's position
is that, because of AMIC's substantial growth and the fact that they were not charged additional
premiums for that growth, Mr. Wells decided he would not submit claims.  (Wozniak Trial Test.,
Mar. 16, 2011; Def.'s Ex. 30, 11/1/2006 Email from Wozniak to Abella, *et al.* ("Steve had a
gentlemen's agreement . . . that he would not be submitting the aggregate losses for that term due
to the substantial growth in the AMIC program that period.").)  The reason for the existence of
the Gentlemen's Agreement was disputed at trial, but the motive for the arrangement is largely
irrelevant to Alliant's equitable estoppel defense.

Mr. Wells testified that the communication he made to Alliant was that AMIC "would not make claims [on the Lloyd's policy], period, as long as [Alliant] continued to treat us fairly."[17] (Trial Tr. vol. 2, 22.) The communication is inherently misleading because Mr. Wells began his Gentlemen's Agreement proposal by making an unequivocal promise of seemingly infinite duration: not making claims "period[.]" (Trial Tr. vol. 2, 22.) However, he then retreated from that promise by attaching his own wholly subjective requirement that AMIC be treated "fairly." (Trial Tr. vol. 2, 22.) In response to Alliant's counsel's question that "ultimately, . . . what you decided treated fairly was was your decision[,]" Mr. Wells evasively responded that "when you shake somebody's hand and then they hit you in the jaw, you realize pretty quickly that the agreement is over with." (Trial Tr. vol. 2, 24.) With this response, Mr. Wells did not dispute the subjectivity of his determination of being treated "fairly."[18] Ultimately, Mr. Wells's promise was that AMIC would not submit claims

---

[17] Mr. Wozniak's version of the Gentlemen's Agreement did not include a requirement that Alliant treat AMIC fairly. (Wozniak Trial Test., Mar. 16, 2011 ("Q:  [D]id Mr. Wells ever say that this [G]entlemen's [A]greement was in place only so long as he was treated fairly?  A: No.").)  However, because AMIC is the non-moving party, AMIC's version of the Gentlemen's Agreement is credited for purposes of this analysis.

[18] It is noteworthy that the series of events that caused Mr. Wells to decide that he was not being treated fairly had nothing to do with the 2000–01 Lloyd's policy.  Rather, Mr. Wells was upset with the length of time it was taking AMIC to get paid on policies from later years that did not involve Lloyd's at all.  Those claims, which were eventually paid, were initially part of this lawsuit, but were dropped by AMIC at trial.

unless AMIC decided to submit claims.  Such a contradictory communication is
inherently misleading.

### 2.    *Reliance by Alliant and Material Harm*

The second and third requirements of Alliant's equitable estoppel defense are
reliance upon AMIC's misleading communication and material harm.  *Hankins v.
Crane*, 979 So. 2d 801, 811 (Ala. Civ. App. 2007) (quoting *Tubbs v. Brandon*, 374
So. 2d 1358, 1361 (Ala. 1979) (stating that "the defendant must have acted in reliance
upon plaintiff's conduct so as to make it inequitable for the plaintiff to assert his
rights.")); *see also Mazer*, 340 So. 2d at 773.

First, it is undisputed that the Gentlemen's Agreement for the 2000–01 Lloyd's
policy extended at least through November 2006, five years after the end of the policy
and at least twenty months after AMIC had claims ready to be submitted.[19]  (Trial Tr.
vol. 2, 30 ("Obviously, it was around November of 2006."); Trial Tr. vol. 1, 37 ("Q:
Is that the conversation around this same time frame, which is November the 20th,
2006, where you told Alliant that the gentlemen's agreement was off?  A:  Yes, it
is.").)

---

[19]  Alliant's position is that AMIC did not rescind the Gentlemen's Agreement until
March 2008.  (Wozniak Trial Test., Mar. 16, 2011.)  However, AMIC's November 2006 position
must be credited.

The first clear occasion of reliance was on February 2, 2005, when Alliant received AMIC's losses on the 2000–01 Lloyd's policy from Mr. Abella, but did not transmit them to be adjusted or paid.  Mr. Wozniak testified that "we [were] only concerned with these years [after November, 2001], because the [G]entlemen's [A]greement handle[d] the 2000–2001 term." (Wozniak Trial Test., Mar. 15, 2011.) On account of the Gentlemen's Agreement, the 2000–01 Lloyd's claims were "[n]ot even being talked about or adjusted at this point."  (Wozniak Trial Test., Mar. 15, 2011.)

The second clear occasion of reliance was in response to Mr. Abella's October 30, 2006 re-submission of the 2000–01 claims.  On October 30, 2006, Mr. Abella again emailed a spreadsheet with AMIC's claims to Alliant.  (Def.'s Ex. 30; Abella Trial Test.)  Mr. Wozniak responded on November 1, 2006:  "Hi [Mr. Abella], . . . [r]egarding the [2000–01 Lloyd's] policy term (18 months), [Mr. Wells] had a [G]entlemen's [A]greement . . . that he would not be submitting the aggregate losses for that term . . . ." (Def.'s Ex. 30.)  After that response to Mr. Abella, on which Mr. Wells was copied, Mr. Wozniak sent an internal email to Mr. Frey and Ms. Heidi Newell directing them to forward the latest spreadsheet to McLarens Young and to inform McLarens Young that it "should only consider the policy terms from 11/01/2001 to 11/1/2004." (Def.'s Ex. 31, 11/1/2006 Email from Wozniak to Newell,

*et al.*)  Although Mr. Wells and AMIC rescinded the Gentlemen's Agreement shortly thereafter, Alliant relied on the Gentlemen's Agreement by not submitting the claims to the reinsurer.

As discussed above, AMIC abided by its promise in the Gentlemen's Agreement for more than five years, and for at least twenty months after it had claims ready to be submitted, and then unilaterally decided that it was not being treated fairly.  In those five years, from August 2001 until November 2006, Alliant relied upon the Gentlemen's Agreement by not submitting AMIC's claims.  The heart of AMIC's claim is that Alliant's submission of AMIC's claims was *untimely*.  Thus, Alliant's reliance on the communication in not submitting the claims when first received materially harmed Alliant.

Finally, Alliant relied upon the Gentlemen's Agreement by not informing Lloyd's of AMIC's growth during the policy period.  (Wozniak Trial Test., Mar. 16, 2011 ("Q: Did you ever tell Lloyd's about AMIC's growth in the 2000–01 time period?  A:  No.").)  For whatever reason, AMIC has not sued Lloyd's or otherwise tested Lloyd's position that AMIC owes a more than off-setting premium, and Alliant now is in the position of holding Lloyd's bag, arguably becoming responsible for indemnifying AMIC for its losses under the Lloyd's policy.  The risk that Alliant has

36

involuntarily assumed on account of Lloyd's refusal to pay AMIC's claims is also Alliant's material harm.

Even if equitable estoppel fails as a defense, laches is a bar to recovery when it is inequitable or unfair to permit a claim to be enforced when some change of condition has taken place that would make the enforcement of a claim unjust. *Gwaltney v. Russell*, 984 So. 2d 1125, 1130 (Ala. 2007). The Gentlemen's Agreement, in effect from August 2001 until November 2006, and its late, unilateral cancellation, is just such a change in condition. By 2006, Lloyd's was long out of the picture; Alliant was no longer providing a reinsurance program for AMIC; memories and records were stale; and there was confusion in the ranks of the parties as to which entity, initially Lloyd's and eventually Alliant, should pay the claims, if at all. AMIC's attempt to hold Alliant liable for its losses under all the circumstances is inequitable and unjust, and is barred by laches. After careful review of all the circumstances, the court concludes that the jury's finding to the contrary is unreasonable as a matter of law.

## V. CONCLUSION

Construing the evidence in the light most favorable to AMIC, the court concludes that the evidence is so weighted in favor of Alliant that reasonable jurors could not arrive at a contrary verdict. Further, as a matter of law, AMIC failed to

prove a legally enforceable contract.  Finally, equity bars recovery by AMIC – any recovery under all the facts and circumstances would be unjust.  Accordingly, it is ORDERED that Alliant's Renewal of Motion for Judgment as a Matter of Law (Doc. # 118) is GRANTED.

It is further ORDERED that the Final Judgment (Doc. # 108) is VACATED. An appropriate final judgment will be entered.

DONE this 9th day of January, 2012.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE